FILED

2004 MAR 16  A 9: 41

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| DAVID S. KROMHOUT<br>        Plaintiff | : | CIVIL ACTION NO.  301CV1636 (SRU) |
| | : | |
| v. | : | |
| | : | |
| RICK R. SMOLICZ, ET AL.<br>        Defendants | : | MARCH 15, 2004 |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On September 23, 1999, Officers Michael Purcaro and Bart Deeley, accompanied by K9

Argo, a police dog in the Naugatuck Police Department, were in the course of investigating a sexual

assault complaint made against the plaintiff, David Kromhout.  The officers, along with Sergeant

Smolicz of the Naugatuck Police Department, went to Mr. Kromhout's residence at 48 Washington

Street, in Naugatuck, Connecticut, in order to make contact with Mr. Kromhout and discuss the

complaint.  Prior to proceeding to Mr. Kromhout's residence the officers knew that Mr. Kromhout

had a criminal record and that he had, in the past, reportedly been violent towards police officers.

When the Naugatuck Police arrived at Mr. Kromhout's residence, he abruptly slammed the

door, fled from the officers and hid under a bed in the residence.  Despite repeated requests from

355797

Officer Deeley to make himself known, Mr. Kromhout continued to hide. Office Deeley, a certified police dog handler with extensive training and experience, utilized the assistance of a trained police dog to locate and apprehend Mr. Kromhout. The police dog behaved consistent with his training, located Mr. Kromhout and apprehended him. The police dog inflicted bite wounds on Mr. Kromhout.

Mr. Kromhout, brings this action alleging that, in part, that Officers Deeley and Purcaro violated his Fourth Amendment Right to be free from the excessive use of force. Mr. Kromhout also seeks to hold the Borough of Naugatuck liable for the alleged violation. The facts of this case support neither plaintiff's claims against the individual officers, nor his claims against the Borough. For this reason, and for the reasons articulated more fully below, the Motion for Summary Judgment should be granted with respect to the entire Amended Complaint.

## BACKGROUND

### I.    THE UNDISPUTED FACTS

On September 23, 1999, Officers Michael Purcaro and Bart Deeley were members of the police department in the Borough of Naugatuck, County of New Haven, in the State of Connecticut and were acting in their official capacities as members of that department. Amended Complaint, dated Dec. 27, 2001, ¶2 ("Am. Compl."); Defendants' Answer and Affirmative Defenses to Amended Complaint, dated January 28, 2002, ¶2 ("Ans."). Officer Deeley has been employed by the

Naugatuck Police Department since 1996. Affidavit of Bart Deeley, dated March 15, 2004, ¶ 3 (attached to Defendants' Motion for Summary Judgment as Exhibit 1). Officer Michael Purcaro has been employed by the Naugatuck Police Department since 1997. Deposition of Michael Purcaro, dated August 22, 2003, at 10 (attached to Defendants' Motion for Summary Judgment as Exhibit 2).

### A.    Officer Deeley Has Received Extensive Training as a Police Dog Handler.

On September 23, 1999, Bart Deeley was also a patrolman in the Naugatuck Police Department and a certified police dog handler. Deeley Aff., ¶ 4. In order to become certified as a police dog handler, Officer Deeley received training from the Connecticut State Police, Canine Unit, in the use of a police dog. Id., ¶ 5. Officer Deeley received training along with K9 Argo, a German Shepard, then owned by the Naugatuck Police Department. Id., ¶ 6. In total, Officer Deeley and K9 Argo had training for approximately sixty (60) hours per week for a period of approximately six (6) months. Id., ¶ 7.

The training, which occurred both in the classroom and the field, included such areas as canine first-aid, canine olfaction, canine health and disease control, search scene management, the legal aspects of using police dogs in law enforcement, and generalized information about canine capabilities and limitations. Id., ¶ 9. K9 Argo underwent extensive obedience training throughout the program learning to respond to Officer Deeley's commands both on and off his leash. Id., ¶ 10. Throughout the course of study, K9 Argo and Officer Deeley were evaluated nearly every week. A

355797                                      3

sample of those weekly evaluations indicates that K9 Argo and Officer Deeley performed satisfactorily throughout the training program. Id., ¶ 11. At the conclusion of the training program, Officer Deeley became certified as police dog handler by the State of Connecticut, Department of Public Safety on June 25, 1998. Id., ¶12.

The Borough of Naugatuck has adopted a uniform policy concerning the use of canines. Id., ¶ 14. The policy concerns all aspects of the use of the police dog, including searches for suspects. Id., ¶15. Under the Borough's K9 usage policy and in accordance with his training with the Connecticut State Police, Officer Deeley could use K9 Argo for a variety of purposes, including apprehending suspects. Id. ¶ 16.

The proper procedure for using a K9 to apprehend a suspect is to warn the suspect that he is being pursued by an officer with a K9, and then wait for approximately two (2) minutes for the suspect to give himself up. Id., ¶ 18. If the suspect does not give himself up, Officer Deeley is trained to release K9 Argo and give him the command to apprehend the suspect. Id., ¶ 19. Once K9 Argo is given the command to apprehend the suspect, consistent with his training at the State Police Academy, K9 Argo is trained to apprehend a suspect by biting him. Id., ¶ 20. Consistent with his training and the policies of the Borough of Naugatuck, on September 23, 1999, Officer Deeley used K9 Argo was used to apprehend David Kromhout, a suspect in a sexual assault investigation and the plaintiff in the above captioned action. Deeley Aff., ¶¶ 22, 23.

**B.      On September 23, 1999, David Kromhout Was a Suspect in an Alleged Sexual Assault and Was Considered Potentially Armed and Dangerous.**

On September 23, 1999, the plaintiff, David Kromhout resided in an apartment at 48 Washington Street in Naugatuck, Connecticut with his live-in girlfriend, Carmella Liguori. Deposition of David Kromhout, dated August 13, 2002, at 16 (attached to Defendants' Motion for Summary Judgment as Exhibit 3). At approximately 6:30 p.m. that evening, Cynthia Jaschinsky, who resided in another apartment located at 48 Washington Street, went to the Naugatuck Police Department's headquarters to file a complaint against David Kromhout. Purcaro Dep. at 12. Ms. Jaschinsky claimed that Mr. Kromhout sexually assaulted her earlier in the day. Id. at 12.

Officer Purcaro was on patrol in Naugatuck, and was dispatched to the police headquarters in Naugatuck to speak with Ms. Jaschinsky regarding her sexual assault complaint. Id. at 12-13. Officer Purcaro met Cynthia Jaschinsky at the Naugatuck Police Department and took a written statement of her complaint. Id. at 21, 27. A copy of Ms. Jaschinsky's written statement is attached to Defendants' Motion for Summary Judgment as Exhibit 4.

Ms. Jaschinsky complained that Mr. Kromhout had assaulted Ms. Liguori earlier in the day on September 23, 1999. Exhibit 4. Ms. Jaschinsky also indicated that Mr. Kromhout had threatened to harm Ms. Liguori's mother and children, during the physical assault on Liguori. Id.; Purcaro Dep. at 44. Ms. Jaschinsky also indicated that Mr. Kromhout had threatened to burn down the apartment building at 48 Washington Street. Exhibit 4; Purcaro Dep. at 44. Officer Purcaro informed Sergeant

Rick Smolicz about Ms. Jaschinsky's complaint. Purcaro Dep. at 23. Sergeant Smolicz of the Naugatuck Police Department took photographs of Ms. Jaschinsky and the injuries that she allegedly sustained during the course of Mr. Kromhout's alleged sexual assault. Deposition of Sergeant Rick Smolicz, dated September 12, 2002, at 68 (attached to Defendants' Motion for Summary Judgment as Exhibit 5).

Officer Purcaro and Sergeant Smolicz decided to contact Mr. Kromhout and Ms. Liguori in order to investigate Ms. Jaschinsky's complaint. Purcaro Dep. at 24. Prior to making contact with Mr. Kromhout, Sergeant Smolicz conducted a background check on Mr. Kromhout by investigating police reports retained by the Naugatuck Police Department and NCIC, a computerized database of criminal justice information including criminal record history information. Smolicz Dep. at 72, 78, 79. Sergeant Smolicz' check revealed that Mr. Kromhout had, allegedly in the past, been extremely violent towards police officers, and further indicated that he had been known to have weapons and explosives on his person. Id. at 78. Sergeant Smolicz' check also revealed that Mr. Kromhout had an extensive criminal history from New York State and further indicated that he might have been on parole or probation. Id. at 75-77. Sergeant Smolicz passed this information on to Officer Purcaro. Id. at 80; Purcaro Dep. at 36-37.

**C.     The Naugatuck Police Officers Arrested David
         Kromhout in Accordance with Proper Police Procedure.**

Officer Purcaro and Sergeant Smolicz proceeded to 48 Washington Street in an effort to

locate and talk to either Mr. Kromhout or Ms. Liguori.  Purcaro Dep. at 46.  Officers Deeley and

O'Mara also went to Carmella Liguori's apartment at 48 Washington Street to assist Officer Purcaro

and Sergeant Smolicz.  Deposition of Bart Deeley, dated August 22, 2002, at 56 (attached to

Defendants' Motion for Summary Judgment as Exhibit 6).  Sergeant Smolicz instructed Officers

Deeley and O'Mara to go to the rear of the house to secure the perimeter of the house so that Mr.

Kromhout did not leave through any rear entrance of the residence.  Smolicz Dep. at 92; Purcaro

Dep. at 46.  Officers Deeley and O'Mara complied with that instruction, Deeley Dep. at 57, and

Officer Purcaro and Sergeant Smolicz went to the door of the apartment occupied by Mr. Kromhout

and Ms. Liguori.  Smolicz Dep. at 97.

Sergeant Smolicz knocked on the door to Ms. Liguori's apartment.  Smolicz Dep. at 97.

Kromhout Dep. at 100.  Mr. Kromhout opened the door and immediately recognized that the

Naugatuck Police officers were at the door.  Id. at 108, 110.  Sergeant Smolicz observed a knife in

Mr. Kromhout's right hand.  Smolicz Dep. at 104-05.  Moreover, he believed that Ms. Liguori had

been crying.  Id. at 101.  Once Mr. Kromhout recognized that it was the police, he closed the door

and attempted to lock it.  Kromhout Dep. at 101.  Mr. Kromhout slammed the door then ran towards

Ms. Liguori's bedroom. Id. at 103. Rather than making himself known to the police and talking with them, Mr. Kromhout hid under Ms. Liguori's bed. Id. at 104.

Carmella Liguori then opened the door and let Officer Purcaro and Sergeant Smolicz into the apartment. Smolicz Dep. at 112; Kromhout Dep. at 108-9. Officer Purcaro and Sergeant Smolicz entered the residence. Am. Compl. ¶ 6. Ans. ¶ 6. Over the police radio, Sergeant Smolicz asked Officer Deeley whether anyone had left the building. Smolicz Dep. at 117-18. Officer Deeley did not see anyone leave the residence and he informed Sergeant Smolicz. Deeley Dep. at 58. Based on his conversation with Ms. Liguori and Officer Deeley, Sergeant Smolicz concluded that Mr. Kromhout was still in the apartment. Smolicz Dep. at 119; Kromhout Dep. at 109.

Officer Deeley and K9 Argo left the perimeter of the residence and went into the apartment to provide assistance to Sergeant Smolicz and Officer Purcaro in locating Mr. Kromhout in the apartment. Am. Compl. ¶ 7; Ans. ¶ 7. Sergeant Smolicz advised Officer Deeley that he believed Mr. Kromhout was armed with a knife. Deeley Dep. at 58. Once in the apartment, Officer Deeley identified himself to Mr. Kromhout by saying "police with K9, considered armed and dangerous . . . drop the knife and come out," or something substantially similar. Deeley Aff., ¶ 26. Mr. Kromhout admits that he heard Officer Deeley identify himself. Specifically, Mr. Kromhout heard the police say, "Come on out with your hands up. Police with K-9." Kromhout Dep. at 109, 149. Instead of complying with the order, Mr. Kromhout remained under Ms. Liguori's bed. Id. at 119. After

approximately two minutes, Mr. Kromhout did not respond, and Officer Deeley gave K9 Argo the command to seek and apprehend Mr. Kromhout. Deeley Aff., ¶ 27.

K9 Argo located Mr. Kromhout under Ms. Liguori's bed. Am. Compl. ¶ 8, Ans. ¶ 8. Officers Deeley and Purcaro and Sergeant Smolicz proceeded to the bedroom because they could hear yelling and fighting between Mr. Kromhout and K-9 Argo coming from underneath the bed. Deeley Dep. at 67. Officer Deeley flipped the box spring and mattress off the bed, exposing Mr. Kromhout struggling with K9 Argo. Deeley Aff., ¶ 28-30; Kromhout Dep. at 133. Mr. Kromhout had grabbed the dog by the snout. Kromhout Dep. 138. Officer Deeley observed a knife with a white handle on the floor near Mr. Kromhout. Deeley Aff., ¶ 30. Officer Deeley took Mr. Kromhout to the ground, gave K9 Argo the "break" command, and Officers Deeley and Purcaro secured Mr. Kromhout's wrists in handcuffs. Id., ¶¶ 31-33. Once one of Mr. Kromhout's wrists was secured in handcuffs, K-9 Argo was given the "break" command, at which point the K-9 released Mr. Kromhout. Deeley Dep. at 72.

Mr. Kromhout sustained dog-bite injuries on his legs. Officer Deeley transported Mr. Kromhout to the Naugatuck Police Station for processing. Kromhout Dep. at 150. Mr. Kromhout was charged with assault, breach of peace, interfering with an officer and assault on a police officer. After processing, while still in police custody, Mr. Kromhout was transported to St. Mary's Hospital in Waterbury, Connecticut.

**D.    Mr. Kromhout Was Treated at St. Mary's Hospital For Injuries Sustained During the Arrest.**

The ambulance run sheet describing Mr. Kromhout's condition at the time he was transported to St. Mary's Hospital indicated that Mr. Kromhout was conscious, alert, and oriented when the ambulance picked him up at the police station. Deposition of Dr. Alan Couture, dated January 21, 2004, at 22 (attached to Defendants' Motion for Summary Judgment as Exhibit 7). The Emergency Medical Technician indicated in his report that Mr. Kromhout had some puncture wounds to his left calf area and some bleeding, which had stopped by the time the EMT arrived at the Naugatuck police station. Id. at 22. The EMT also indicated that Mr. Kromhout had consumed alcohol. Id. at 22.

Mr. Kromhout's medical records from St. Mary's indicate that he was combative with Hospital personnel. Id. at 33. Dr. Couture, the emergency room attending physician at St Mary's on the night of Mr. Kromhout's arrest, conducted a physical examination of Mr. Kromhout's head, eyes, ears, nose and neck and throat, commonly referred to as a HEENT examination. Id. at 34. After conducting the HEENT examination, Dr. Couture saw no evidence of trauma to Mr. Kromhout's scalp. Id. at 35. Dr. Couture also found that Mr. Kromhout's neck was not tender. Id. at 35. Dr. Couture also ordered a blood alcohol test, which revealed that Mr. Kromhout was legally intoxicated with a blood alcohol level of 119. Dr. Couture concluded that an hour earlier, at the time of the arrest, Mr. Kromhout's blood alcohol level would have been 175. Id. at 44-45. Someone, like Mr.

Kromhout, with a blood alcohol level of 175, would have slurred words, have a difficult time walking, a diminished level of consciousness. Id. at 48.

Ultimately, Mr. Kromhout was diagnosed with compartment syndrome as a result of the dog bite and remained hospitalized for four days. Id. at 61.

### E.    The Borough of Naugatuck Conducted a Proper Investigation of This and Other Claims of Excessive Force .

Following the incident, Lieutenant Jerry Scully of the Naugatuck conducted an investigation of the incident. Deeley Dep. at 81. Lieutenant Scully is Officer Deeley's supervisor. Id. at 81. Lieutenant Scully, or another supervisor, conducts an investigation every time that the K-9 is utilized. Id. at 82. In connection with that investigation, Officer Deeley submitted a written report summarizing his recollections of the events surrounding Mr. Kromhout's arrest. Id. at 83.

The Borough of Naugatuck has several procedures in place for handling citizen complaints of police misconduct. Affidavit of Dennis Clisham, dated March 15, 2004, ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 8). The Naugatuck Police Department is overseen by a Board of Police Commissioners. Id., ¶5 Typically when a citizen makes a complaint of police misconduct, they are provided with a kit, which details the procedures to be followed in making a complaint. Id., ¶ 6. Once a civilian complaint is received it is assigned to either Deputy Police Chief Hunt or Captain James Fortin of the Naugatuck Police Department to conduct an internal investigation of the complaint. Id., ¶ 7. The exact nature of the internal investigation obviously

depends on the severity of the complaint. <u>Id.</u>,¶ 8. At the conclusion of each investigation, a written report is prepared. <u>Id.</u>,¶ 9.

With respect to complaints of excessive use of force, including complaints related to the use of K9 force, Chief Clisham reviews the report and make a decision whether to forward the complaint to the Board of Police Commissioners. <u>Id.</u>, ¶ 10. The severest complaints are referred to the Board of Police Commissioners. <u>Id.</u>, ¶ 11. During the time that Chief Clisham has been the chief of police, several officers have been disciplined for violations of the Naugatuck Police Department's rules and regulations. <u>Id.</u>, ¶ 11. During that time, the Board of Police Commissioners has conducted several hearings regarding the discipline of officers. <u>Id.</u>, ¶ 12. The discipline imposed upon these officers has followed a progression ranging from verbal warnings, to written warnings, to suspension and discharge. <u>Id.</u>, ¶ 13.

## II.   **THE PLAINTIFF'S CLAIMS**

The plaintiff, David Kromhout, brought the present action against the Borough of Naugatuck, Officer Deeley and Officer Purcaro. The First Count of plaintiff's Amended Complaint, alleges in part, violations by Officer Deeley of Mr. Kromhout's rights under the Fourth Amendment of the United States Constitution to be free from the excessive use of force and free from unreasonable searches and seizures. Am. Compl., First Count, ¶ 7. Plaintiff seeks to hold Officer Purcaro liable on the theory that Officer Purcaro failed to intervene to prevent the alleged violations of Mr. Kromhout's

rights. Id., ¶ 18. In the Third Count of the Amended Complaint, plaintiff seeks to hold the Borough of Naugatuck liable for the purported violations on the grounds that the Borough of Naugatuck knew or should have known of other civil complaints brought against Sergeant Smolicz, which complained of other acts of alleged misconduct. Am. Compl., Third Count ¶ 21. The plaintiff alleges that the Borough failed to take remedial action and therefore, acquiesced in Sergeant Smolicz' alleged violation here. Id., ¶ 22.

The plaintiff also alleges that the Borough should be held liable for the alleged constitutional violations of Officer Deeley and K9 Argo because it knew or should have known of other complaints regarding the alleged misconduct of Officer Deeley and K9 Argo and failed to take any action to prevent Officer Deeley from coming into contact with other suspects. Am. Compl., Fourth Count, ¶¶ 19, 20. The plaintiff also alleged that the Borough should be held liable for the alleged constitutional violations on the ground that it failed to adequately train its police officers, thereby failing to adequately prevent constitutional violations. Am. Compl., Fifth Count, ¶ 24. Finally, plaintiff asserts two state law causes of action, for assault, battery and trespass (Second Count) and for violation of Section 22-357 of the Connecticut General Statutes (Sixth Count).

Contrary to the allegations in the Amended Complaint, plaintiff has provided no evidence to support a claim of liability against Officers Deeley, Purcaro and the Borough of Naugatuck. The documentary evidence submitted with this Motion establishes that neither Officer Deeley nor Purcaro

is liable for a violation of the plaintiff's rights under the Fourth Amendment to the United States Constitution. Moreover, plaintiff's theories of recovery against the Borough are illusory and based on conjecture. There are no genuine issues of material fact regarding these claims. Accordingly, this motion for summary judgment should be granted with respect to every count in plaintiff's complaint.

## ARGUMENT

A motion for summary judgment should be granted if the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); see generally Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970); Cronin, 46 F.3d at 202.

The Second Circuit has ruled that "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985). Instead, *the plaintiff must offer concrete evidence raising genuine disputes of material fact tending to show that his version of events is more than fanciful.* Johnson v. Carpenter Tech. Corp., 723 F. Supp. 180, 182 (D. Conn. 1989) (emphasis added). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-

movant]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  Plaintiff cannot meet this burden

with respect to any of his claims.  The defendants are entitled to summary judgment.

## I.     THE PLAINTIFF CANNOT ESTABLISH THAT OFFICERS DEELEY OR PURCARO VIOLATED 28 U.S.C. § 1983.

Section 1983 of Title 42 of the United States Code "provides a remedy for deprivations of

rights secured by the Constitutions and laws of the United States . . . " <u>Lugar v. Edmondson Oil Co.</u>,

457 U.S. 922, 924 (1982).  In order to state a claim upon which relief can be granted pursuant to 42

U.S.C. §1983, a plaintiff "must allege (1) that the challenged conduct was attributable at least in part

to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right,

privilege, or immunity secured by the Constitution or laws of the United States." <u>Dwares v. City of</u>

<u>New York</u>, 985 F.2d 94, 98 (2d Cir. 1993).  In addition, a plaintiff must demonstrate that his injuries

were proximately caused by the defendant's violation of law.  <u>See</u> <u>Atkins v. New York City</u>, 143 F.3d

100, 103 (2d Cir. 1998).  Based on the undisputed facts, the plaintiff cannot establish that he was

denied a right, privilege or immunity secured by the Constitution or laws of the United States.

### A.     Officer Deeley Did Not Violate Plaintiff's Fourth Amendment Right to Be Free From the Excessive Use of Force.

In Count I, the plaintiff alleges that the Officer Deeley used excessive force in subduing the

plaintiff during plaintiff's arrest on September 23, 1999. The Supreme Court has squarely decided

that the only source of constitutional protection against alleged claims of excessive force in the

course of an arrest is the Fourth Amendment.  See Graham v. Connor, 490 U.S. 386 (1988); see also

Hughes v. City of Hartford, 96 F. Supp. 2d 114, 115, n.2 (D. Conn. 2000) (plaintiff withdrew

Fourteenth Amendment claim in the face of Motion to Dismiss).  "To establish an excessive force

claim, plaintiff must show that the force used by the officers, in light of the facts and circumstances

confronting them, was unreasonable."  Williams v. Lopes, 64 F. Supp. 2d 37, 43 (D. Conn. 1999);

see also Finnegan v. Fountain, 915 F.2d 817, 823 (2d Cir. 1990).  "The 'reasonableness' of a

particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.  In particular,

> [T]he calculus of reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second judgments – in
> circumstances that are tense, uncertain, and rapidly evolving – about the
> amount of force that is necessary in a particular situation.  As in other
> Fourth Amendment contexts, however, the "reasonableness" inquiry in an
> excessive force case is an objective one: the question is whether the
> officers' actions are 'objectively reasonable' in light of the facts and
> circumstances confronting them, without regard to their underlying intent
> or motivation.

Id. at 396-97 (emphasis added).  "Accordingly, police receive a fairly wide zone of protection in

close cases involving potential danger, emergency conditions and other exigent circumstances."

Thompson v. City of Meriden, No. 3:94-CV-1950, 1999 U.S. Dist. LEXIS 6991, at *20 (D. Conn.

Apr. 14, 1999) (attached to this Memorandum of Law at Tab 1).

In short, the determination of whether the force used during an arrest was "reasonable" requires balancing the nature and quality of the intrusion against the countervailing governmental interests at stake. Lennon, 66 F.3d at 425. Courts assess the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 396 (internal quotations omitted).

In applying this balancing test, courts that have considered the reasonableness of a decision to use a K9 have consistently concluded that when a fleeing or evasive suspect is warned of potential K9 use, ignores the warnings, and is ultimately apprehended by the K9, the decision to use the K9 is reasonable under the Fourth Amendment: In fact, decisions upholding the use of police dogs to apprehend suspects by biting and holding them all involved fleeing or hiding subjects who were suspected of violent crimes, and where there was at least some evidence of danger to police officers. See, e.g., Jarrett v. Town of Yarmouth, 331 F.3d 140, 150 (1st Cir. 2003) (police use of a canine to bite and hold a suspected armed robber was reasonable even though the officer could not definitively discern whether the fleeing suspect was armed); Quintanilla v. City of Downey, 84 F.3d 353, 354 (9th Cir. 1996) (affirming defense verdict where dog was used to locate and apprehend vehicle theft suspect who was hiding in the dark after throwing a bottle at police); Matthews v. Jones, 35 F.3d

1046, 1052 (6th Cir. 1994) (affirming summary judgment for defense where dog first located suspect who had fled after traffic chase into dark woods, and dog then attacked when suspect moved despite police officer's order to remain still); <u>Robinette v. Barnes</u>, 854 F.2d 909, 913 (6th Cir. 1988) (affirming summary judgment for defense where dog attacked burglary suspect hiding in the dark); <u>Carey v. Cassista</u>, 939 F. Supp. 136 (D. Conn. 1996) (finding for defense where dog located and bit man stopped for drunk driving who then fled into woods).

Consistent with the case law cited above, the Ninth Circuit recently concluded that the use of a K9 in circumstances similar to those presented here was, as a matter of law, reasonable, and thus not a violation of a suspect's Fourth Amendment rights. <u>Miller v. Clark County</u>, 340 F.3d 949 (2003). In <u>Miller</u>, the defendant police officer attempted to pull over a vehicle because the officer suspected that the vehicle had been stolen. After the officer turned on his sirens, the vehicle did not pull over, but slowed, eventually proceeding to the driveway of a nearby home. <u>Id.</u> at 960. A passenger exited the vehicle on foot, as did the driver. A defendant officer, along with his K9, arrived on the scene to locate the fleeing suspects. <u>Id.</u>

As in this case, the officers in <u>Miller</u> had reason to believe that the fleeing suspects were not "law enforcement friendly." <u>Id.</u> The K9 officer shouted a warning, to which the fleeing suspect did not respond. Shortly thereafter, the K9 officer released the police dog with a command to apprehend the fleeing suspect. <u>Id.</u> at 961. The dog located the individual hiding in the woods, bit him several

times, and held him until the K9 officer could secure him. Id. The trial court granted summary judgment for the defendant officer, and that decision was upheld by the Court of Appeals.

The Ninth Circuit held that the government interest in seizing the plaintiff was high, especially in light of the fact that the fleeing individual was a suspected felon. Id. The court also reasoned that the suspect posed a significant threat to the officer's safety, especially given the fact that the individual defied the officer's request to make himself known. Id. at 964-65. Moreover, the officers suspected that there was the potential that the fleeing suspect was not "law enforcement friendly." Id. at 964-65. Finally, the court found that the suspect was attempting to evade arrest by hiding. In light of all these facts, the Appellate Court affirmed the trial court's summary judgment ruling that the use of a K9 was, as a matter of law, reasonable under these circumstances and did not amount to a violation of the suspect's Fourth Amendment Rights. Id. at 966.

Defendants respectfully submit that this court should reach the same conclusion here. Officer Deeley was investigating a violent crime—a potential sexual assault by Mr. Kromhout against both Cynthia Jaschinsky and Carmella Liguori. The officers suspected that Mr. Kromhout may have a knife. Deeley Dep. at 58. Mr. Kromhout ignored not only one, but two, warnings to make himself known to the police. Deeley Aff. ¶ 26; Kromhout Dep. at 109, 119, 149. Mr. Kromhout chose to evade the police, and hide. And finally, like the defendant officer in Miller, the officers were under the impression that Mr. Kromhout had a history of being hostile toward police. Smolicz Dep. at 72,

79. These are the same factors that the Ninth Circuit found persuasive in <u>Miller</u>. For the same reasons, this court should conclude that as a matter of law, Officer Deeley's use of K9 Argo to apprehend Mr. Kromhout was reasonable, and thus did not amount to a violation of the Fourth Amendment.

Plaintiff's Complaint also seeks to hold Officer Deeley liable for violating his right to be free from excessive use of force on the grounds that Officer Deeley "struck Mr. Kromhout repeatedly in the head." Am. Compl., Count 1, ¶ 13. Plaintiff's allegation that he was repeatedly struck in the head is merely conclusory, however, and is unsupported by the evidence. Dr. Alan Couture, the physician that treated Mr. Kromhout at St. Mary's Hospital immediately following his arrest, conducted a thorough examination of Mr. Kromhout's head and neck. Couture Dep. at 34. Dr. Couture found no evidence whatsoever that Mr. Kromhout had been struck in the head. <u>Id.</u> at 35. Mr. Kromhout never complained to Dr. Couture or any medical professionals at St. Mary's that he had sustained any injuries to the head. <u>Id.</u> at 74.

**B.      Officer Purcaro Is Not Liable For Failing to Intervene.**

Plaintiff seeks to hold Officer Purcaro liable for violating Mr. Kromhout's Fourth Amendment Right to be free from the excessive use of force on the theory that Officer Purcaro "failed to intervene to prevent Mr. Kromhout from being attached and maimed by Argo and thereby being subjected to the excessive use of force." Am. Compl., Count 1, ¶ 18. The evidence, however,

does not support a cause of action against Officer Purcaro on this theory, however. Accordingly, summary judgment should be granted for the defendants.

It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); Webb v. Hiykel, 713 F.2d 405, 408 (8th Cir. 1983); Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982), cert. denied, 459 U.S. 1171 (1983); Byrd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972). An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, O'Neill, 839 F.2d at 11-12; (2) that a citizen has been unjustifiably arrested, Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982); or (3) that any constitutional violation has been committed by a law enforcement official, O'Neill, 839 F.2d at 11. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Id. at 11-12. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise. Id.

Here, as discussed above, the undisputed evidence indicates that Officer Deeley committed no violation of Mr. Kromhout's constitutional rights. Accordingly, the plaintiff's cause of action against

Officer Purcaro on a theory that he had a duty to intervene must fall as well. See, e.g., Richardson v. City of Indianapolis, 658, F.2d 494, 500 (7th Cir. 1984) (a claim that an officer failed to intervene in preventing a constitutional right is untenable where the facts lead to a conclusion that there was no constitutional violation). Moreover, Mr. Kromhout's arrest occurred within a matter of seconds. Accordingly, had any violation of Mr. Kromhout's rights been occurring, Officer Purcaro would not have had an adequate opportunity to intervene to stop the violation. Accordingly, this cause of action against him necessarily fails. See, e.g., Ting v. United States, 927 F.2d 1504, 1511 (9th Cir. 1991) (no liability for officer failing to intervene where entire violation occurred within a matter of seconds).

### C.    The Officers Did Not Conduct an Unreasonable Search.

Plaintiff apparently claims that the officers violated his right to be free from unreasonable searches under the Fourth Amendment of the United States Constitution. Am. Compl. ¶ 17. Specifically, plaintiff claims that Officer Purcaro and Sergeant Smolicz entered the apartment without a warrant and without obtaining consent of either Mr. Kromhout or Ms. Liguori. Plaintiff's claim is unsupported by the facts of this case, however.

It is well established that the Fourth Amendment is the source of constitutional protection against unreasonable search and seizures. Wilson v. Lane, 526 U.S. 603, 610 (1999). The United States Supreme Court has "held that the Fourteenth Amendment extends this constitutional guarantee

355797                                                  22

to searches and seizures by state officers." <u>Vernonia School District v. Acton</u>, 515 U.S. 646, 652 (1995). The Fourth Amendment warrant requirement guarantees the fundamental right to be free from government intrusion into the privacy of one's home. <u>See</u> <u>Payton v. New York</u>, 445 U.S. 573, 585-86 (1980). "It is well-settled, however, that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." <u>U.S. v. MacDonald</u>, 916 F.2d 766, 769 (2d Cir. 1990); <u>United States v. Gori</u>, 230 F.3d 44, 50 (2d Cir. 2000). "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." <u>MacDonald</u>, 916 F.2d at 769. The Second Circuit considers six factors as guides to determining whether immediate police action is necessary:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

<u>State v. Fields</u>, 113 F.3d 313, 323 (2d Cir. 1997).

These factors illustrate the type of facts relevant to the exigency inquiry. <u>MacDonald</u>, 916 F.2d at 770. The list of factors, however, is not exhaustive, and not all of the facts listed must be present to find exigent circumstances. <u>Id.</u> Courts must apply an objective standard to determine the

reasonableness of the officer's belief. <u>Mincey v. Arizona</u>, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid").

In the present case, the majority of these factors mitigate in favor of a finding that exigent circumstances existed on September 23, 1999, which permitted Officer Purcaro and Sergeant Smolicz to enter Mr. Kromhout's apartment without a warrant. Namely, the officers were investigating Mr. Kromhout as an alleged perpetrator of a sexual assault, certainly a grave and violent offense. Purcaro Dep. at 12, 25; Exhibit 4. Secondly, Sergeant Smolicz testified that at the time he entered Mr. Kromhout's residence, he believed that Mr. Kromhout was armed with a knife. Smolicz Dep. at 104-05. The officers had every reason to believe that Mr. Kromhout was inside the residence, given that he answered the door in the first place. Kromhout Dep. at 100. Moreover, the Sergeant Smolicz must have considered it a reasonable possibility that Mr. Kromhout would try to flee from the police, given the fact that he had Officers Deeley and O'Mara set guard the perimeter of the home and the fact that Mr. Kromhout slammed the door and attempted to lock it when he recognized that the police were at his apartment. In short, these facts give rise to the conclusion that exigent circumstances existed, justifying the officers' entry into the home.