**FILED**

2004 MAR 16  A 9: 41

U.S. DISTRICT COURT
UNITED STATES DISTRICT COURBRIDGEPORT, CONN
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID S. KROMHOUT : | CIVIL ACTION NO.  301CV1636 (SRU) |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| RICK R. SMOLICZ, ET AL. : | |
| Defendants | MARCH 15, 2004 |

## LOCAL RULE 56(c)(1) STATEMENT IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Local Rules of Civil Procedure, the defendants, the Borough of

Naugatuck, Officers Bart Deeley and Michael Purcaro, respectfully offer the following Statement of

Undisputed Material Facts in support of their Motion for Summary Judgment.

      1.     On September 23, 1999, Officers Michael Purcaro and Bart Deeley were members of

the police department in the Borough of Naugatuck, County of New Haven, in the State of

Connecticut and were acting in their official capacities as members of that department.  Amended

Complaint, dated Dec. 27, 2001, ¶2 ("Am. Compl."); Defendants' Answer and Affirmative Defenses

to Amended Complaint, dated January 28, 2002, ¶2 ("Ans.").

355227

2.      Officer Deeley has been employed by the Naugatuck Police Department since 1996. Affidavit of Bart Deeley, dated March 15, 2004, ¶3 (attached to Defendants' Motion for Summary Judgment as Exhibit 1).

3.      Officer Michael Purcaro has been employed by the Naugatuck Police Department since 1997.  Deposition of Michael Purcaro, dated August 22, 2003, at 10 (attached to Defendants' Motion for Summary Judgment as Exhibit 2).

I.      **Officer Deeley Has Received Extensive Training as a Police Dog Handler.**

4.      On September 23, 1999, Bart Deeley was also a patrolman in the Naugatuck Police Department and a certified police dog handler.  Deeley Aff., ¶4.

5.      In order to become certified as a police dog handler, Officer Deeley received training from the Connecticut State Police, Canine Unit, in the use of a police dog.  Deeley Aff., ¶5.

6.      Officer Deeley received training along with K9 Argo, a German Shepard, then owned by the Naugatuck Police Department.  Deeley Aff., ¶6.

7.      In total, Officer Deeley and K9 Argo had training for approximately sixty (60) hours per week for a period of approximately six (6) months.  Deeley Aff., ¶7.

8.      The training, which occurred both in the classroom and the field, included such areas as canine first-aid, canine olfaction, canine health and disease control, search scene management, the

355227                                                    2

legal aspects of using police dogs in law enforcement, and generalized information about canine

capabilities and limitations. Deeley Aff., ¶9.

9.      K9 Argo underwent extensive obedience training throughout the program learning to

respond to Officer Deeley's commands both on and off his leash. Deeley Aff., ¶10.

10.     Throughout the course of study, K9 Argo and Officer Deeley were evaluated nearly

every week. A sample of those weekly evaluations indicates that K9 Argo and Officer Deeley

performed satisfactorily throughout the training program. Deeley Aff., ¶11

11.     At the conclusion of the training program, Officer Deeley became certified as police

dog handler by the State of Connecticut, Department of Public Safety on June 25, 1998. Deeley

Aff., ¶12.

12.     Following Officer Deeley's certification as a police dog handler, he and K9 Argo were

accepted into and completed training as a narcotics detection team. Deeley Aff., ¶13.

13.     The Borough of Naugatuck has adopted a uniform policy concerning the use of

canines. Deeley Aff., ¶14.

14.     The policy concerns all aspects of the use of the police dog, including searches for

suspects. Deeley Aff., ¶15.

15.    Under the Borough's K9 usage policy and in accordance with his training with the Connecticut State Police, Officer Deeley may use K9 Argo to apprehend a suspect when that suspect is potentially armed.  Deeley Aff., ¶ 16.

16.    Consistent with Officer Deeley's training and the Borough's policy, he may use K9 Argo to apprehend a suspect when that suspect is potentially armed.  Deeley Aff., ¶ 17.

17.    The proper procedure for using a K9 to apprehend a suspect is to warn the suspect that he is being pursued by an officer with a K9, and then wait for approximately two (2) minutes for the suspect to give himself up.  Deeley Aff., ¶ 18.

18.    If the suspect does not give himself up, Officer Deeley is trained to release K9 Argo and give him the command to apprehend the suspect.  DeeleyAff., ¶ 19.

19.    Once K9 Argo is given the command to apprehend the suspect, consistent with his training at the State Police Academy, K9 Argo is trained to apprehend a suspect by biting him.  Deeley Aff., ¶ 20.

20.    The Naugatuck Police Department's current K9 usage policy also requires K9 officers to keep a K9 usage log.   Deeley Aff., ¶ 21.

21.    Each entry in the K9 Usage Log indicates the incident number, incident date, the suspect's name, whether the suspect was injured, whether the suspect received medical treatment,

which canine officer handled the police dog, which particular police dog was used, how the dog was used, and whether the suspect was bitten.  Deeley Aff., ¶ 22.

22.    The K9 Usage Log contains an entry for September 23, 1999, indicting that K9 Argo was used to apprehend David Kromhout, a suspect in a sexual assault investigation and the plaintiff in the above captioned action.  Deeley Aff., ¶¶ 22, 23.

**II.    On September 23, 1999, David Kromhout Was a Suspect in an Alleged Sexual Assault and Was Considered Potentially Armed and Dangerous.**

23.    On September 23, 1999, at approximately 6:30 p.m., Cynthia Jaschinsky went to the Naugatuck Police Department's headquarters to file a complaint against David Kromhout, the plaintiff in this action.  Purcaro Dep. at 12.

24.    Ms. Jaschinsky claimed that Mr. Kromhout sexually assaulted her earlier in the day. Purcaro Dep. at 12.

25.    Cynthia Jaschinsky resided in an apartment at 48 Washington Street in Naugatuck, Connecticut.  Deposition of David Kromhout, dated August 13, 2002, at 117 (attached to Defendants' Motion for Summary Judgment as Exhibit 3).

26.    On September 23, 1999, the plaintiff, David Kromhout, also resided at 48 Washington Street in Naugatuck, Connecticut with his live-in girl friend, Carmella Liguori, and her two children. Kromhout Dep. at 16.

355227                                                    5

27.     Officer Purcaro was on patrol in Naugatuck, and was dispatched to the police headquarters in Naugatuck to speak with Ms. Jaschinsky regarding her sexual assault complaint. Purcaro Dep. at 12-13.

28.     Officer Purcaro met Cynthia Jashinsky at the Naugatuck Police Department and took a written statement of her complaint.  Purcaro Dep. at 21, 27.

29.     A copy of Ms. Jaschinsky's written statement is attached to Defendants' Motion for Summary Judgment as Exhibit 4.

30.     Ms. Jaschinsky complained that Mr. Kromhout had assaulted Ms. Liguori earlier in the day on September 23, 1999.  Exhibit 4.

31.     Ms. Jaschinsky also indicated that Mr. Kromhout had threatened to harm Ms. Ligouri's mother and children, during the physical assault on Ligouri.  Exhibit 4; Purcaro Dep. at 44.

32.     Ms. Jaschinsky also indicated that Mr. Kromhout had threatened to burn down the apartment building at 48 Washington Street.  Exhibit 4; Purcaro Dep. at 44.

33.     Officer Purcaro informed Sergeant Rick Smolicz about Ms. Jaschinsky's complaint. Purcaro Dep. at 23.

34.     Sergeant Smolicz of the Naugatuck Police Department took photographs of Ms. Jaschinsky and injuries that she allegedly sustained during the course of Mr. Kromhout's alleged

sexual assault. Deposition of Sergeant Rick Smolicz, dated September 12, 2002, at 68 (attached to Defendants' Motion for Summary Judgment as Exhibit 5).

35.    Officer Purcaro and Sergeant Smolicz decided to contact Mr. Kromhout and Ms. Liguori in order to investigate Ms. Jaschinsky's complaint. Purcaro Dep. at 24-25.

36.    Prior to making contact with Mr. Kromhout, Sergeant Smolicz conducted a background check on Mr. Kromhout by investigating police reports retained by the Naugatuck Police Department and NCIC, a computerized database of criminal justice information including criminal record history information. Smolicz Dep. at 72, 79.

37.    Sergeant Smolicz' check revealed that Mr. Kromhout had, allegedly in the past, been extremely violent towards police officers, and further indicated that he had been known to have weapons and explosives on his person. Smolicz Dep. at 78.

38.    Sergeant Smolicz' check also revealed that Mr. Kromhout had an extensive criminal history from New York State and further indicated that he might have been on parole or probation. Smolicz Dep. at 75-77.

39.    Sergeant Smolicz passed this information on to Officer Purcaro. Smolicz. Dep. at 80; Purcaro Dep. at 36-37.

### III.    The Naugatuck Police Officers Arrested David Kromhout in Accordance with Proper Police Procedure.

40.    Officer Purcaro and Sergeant Smolicz proceeded to 48 Washington Street in an effort to locate and talk to either Mr. Kromhout or Ms. Liguori.  Purcaro Dep. at 46.

41.    At approximately 9:48 p.m., Officers Deeley and O'Mara also went to Carmella Liguori's apartment at 48 Washington Street to assist Officer Purcaro and Sergeant Smolicz. Deposition of Bart Deeley, dated August 22, 2002, at 56 (attached to Defendants' Motion for Summary Judgment as Exhibit 6).

42.    Sergeant Smolicz instructed Officers Deeley and O'Mara to go to the rear of the house to secure the perimeter of the house.  Smolicz Dep. at 92.

43.    Sergeant Smolicz ordered Officers Deeley and O'Mara to secure the perimeter in order to ensure that Mr. Kromhout did not leave through any rear entrance at 48 Washington Street. Deeley Dep. at 57; Smolicz Dep. at 92; Purcaro Dep. at 46.

44.    Officers Deeley and O'Mara complied with that instruction and secured the perimeter of the building.  Deeley Dep. at 57.

45.    Officer Purcaro and Sergeant Smolicz went to the apartment occupied by Mr. Kromhout and Ms. Liguori.  Smolicz Dep. at 97.

46.    Sergeant Smolicz knocked on the door to Ms. Liguori's apartment.  Smolicz Dep. at 97. Kromhout Dep. at 100.

355227                                              8

47.    Mr. Kromhout opened the door.  Kromhout Dep. at 100.

48.    Sergeant Smolicz observed a knife in Mr. Kromhout's right hand.  Smolicz Dep. at 104-05.

49.    Moreover, he believed that Ms. Liguori had been crying.  Smolicz Dep. at 101.

50.    Mr. Kromhout immediately recognized that the Naugatuck Police officers were at the door.  Kromhout Dep. at 108.

51.    Once Mr. Kromhout recognized that it was the police at the door, he closed the door and attempted to lock it.  Kromhout Dep. at 101.

52.    After Mr. Kromhout locked the door, he proceeded away from the door toward Ms. Liguori's bedroom.  Kromhout Dep. at 103.

53.    Rather than making himself known to the police and talking with them, Mr. Kromhout hid under Ms. Liguori's bed.  Kromhout Dep. at 104.

54.    Carmella Liguori then opened the door and let Officer Purcaro and Sergeant Smolicz into the apartment.  Smolicz Dep. at 112; Kromhout Dep. at 108-9.

55.    Officer Purcaro and Sergeant Smolicz entered the residence at approximately 9:00 p.m.  Am. Compl. ¶ 6.  Ans. ¶ 6.

56.    Over the police radio, Sergeant Smolicz asked Officer Deeley whether anyone had left the building.  Smolicz Dep. at 117-18.

355227                                    9

57.    Officer Deeley did not see anyone leave the residence and he informed Sergeant Smolicz. Deeley Dep. at 58.

58.    Based on his conversation with Ms. Ligouri and Officer Deeley, Sergeant Smolicz concluded that Mr. Kromhout was still in the apartment. Smolicz Dep. at 119; Kromhout Dep. at 109.

59.    Officer Deeley and K9 Argo left the perimeter of the residence and went into the apartment to provide assistance to Sergeant Smolicz and Officer Purcaro in locating Mr. Kromhout in the apartment. Am. Compl. ¶ 7; Ans. ¶ 7

60.    Sergeant Smolicz advised Officer Deeley that he believed Mr. Kromhout was armed with a knife. Deeley Dep. at 58.

61.    Once in the apartment, Officer Deeley identified himself to Mr. Kromhout by saying "police with K9, considered armed and dangerous . . . drop the knife and come out," or something substantially similar. Deeley Aff., ¶ 26.

62.    Mr. Kromhout admits that he heard Officer Deeley identify himself. Specifically, Mr. Kromhout heard the police say, "Come on out with your hands up. Police with K-9." Kromhout Dep. at 109.

63.    Yet, Mr. Kromhout remained under Ms. Liguori's bed. Kromhout Dep. at 104.

64.     After approximately two minutes, Mr. Kromhout did not respond, and Officer Deeley gave K9 Argo the command to seek and apprehend Mr. Kromhout.  Deeley Aff., ¶ 27.

65.     K9 Argo located Mr. Kromhout under Ms. Liguori's bed.  Am. Compl. ¶ 8, Ans. ¶ 8.

66.     Officers Deeley and Purcaro and Sergeant Smolicz proceeded to the bedroom because they could hear yelling and fighting between Mr. Kromhout and K-9 Argo coming from underneath the bed.  Deeley Dep. at 67.

67.     Officer Deeley flipped the box spring and mattress off the bed, exposing Mr. Kromhout struggling with K9 Argo.  Deeley Aff., ¶ 28-30; Kromhout Dep. at 133.

68.     Mr. Kromhout had grabbed the dog by the snout.  Kromhout Dep. 138.

69.     Officer Deeley observed a knife with a white handle on the floor near Mr. Kromhout. Deeley Aff., ¶ 30.

70.     Officer Deeley took Mr. Kromhout to the ground, gave K9 Argo the "break" command, and Officers Deeley and Purcaro secured Mr. Kromhout's wrists in handcuffs.  Deeley Aff., ¶¶ 31-33.

71.     Once one of Mr. Kromhout's wrists was secured in handcuffs, K-9 Argo was given the "break" command, at which point the K-9 released Mr. Kromhout.  Deeley Dep. at 72.

72.     Mr. Kromhout sustained dog-bite injuries on his legs.  Am. Compl., First Count, ¶ 14.

73.    Officer Deeley transported Mr. Kromhout to the Naugatuck Police Station for processing.  Kromhout Dep. at 150.

74.    Mr. Kromhout was charged with assault, breach of peace, interfering with an officer and assault on a police officer.  Kromhout Dep. at 197.

75.    Mr. Kromhout was convicted on a charge of interfering with an officer after pleading nolo contendere to that charge.  Kromhout Dep. at 197.

76.    The remaining charges against Mr. Kromhout were nolled.  Kromhout Dep. at 197.

77.    After processing, while still in police custody, the Mr. Kromhout was transported to St. Mary's Hospital in Waterbury, Connecticut.  Deposition of Dr. Alan Couture, dated January 21, 2004, at 22 (attached to Defendants' Motion for Summary Judgment as Exhibit 7).

IV.    **Mr. Kromhout's Medical Records Following His Arrest Reveal that He was Intoxicated at the Time of His Arrest.**

78.    The ambulance run sheet describing Mr. Kromhout's condition at the time he was transported to St. Mary's Hospital indicated that Mr. Kromhout was conscious, alert, and oriented when the ambulance picked him up at the police station.  Couture Dep. at 22.

79.    The Emergency Medical Technician indicated in his report that Mr. Kromhout had some puncture wounds to his left calf area and some bleeding, which had stopped by the time the EMT arrived at the Naugatuck police station.  Couture Dep. at 22.

80.     The EMT also indicated that Mr. Kromhout had consumed alcohol.  Couture Dep. at 22.

81.     Upon arrival at St. Mary's, Mr. Kromhout refused to provide any medical history, or tell the nurses or physicians about any medications that he was taking or whether he had any allergies to medicines.

82.     The medical records indicate that Mr. Kromhout was combative with Hospital personnel. Couture Dep. at 33.

83.     Dr. Couture, the emergency room attending physician at St Mary's on the night of Mr. Kromhout's arrest, conducted a physical examination of Mr. Kromhout's head, eyes, ears, nose and neck and throat, commonly referred to as a HEENT examination.  Couture Dep. at 34.

84.     After conducting the HEENT examination, Dr. Couture saw no evidence of trauma to Mr. Kromhout's scalp.  Couture Dep. at 35.

85.     Dr. Couture also found that Mr. Kromhout's neck was not tender.  Couture Dep. at 35.

86.     Dr. Couture also ordered a blood alcohol test, which revealed that Mr. Kromhout was legally intoxicated with a blood alcohol level of 119.

87.     Dr. Couture concluded that an hour earlier, at the time of the arrest, Mr. Kromhout's blood alcohol level would have been 175.  Couture Dep. at 44-45.

355227                                                    13

88.    Someone, like Mr. Kromhout, with a blood alcohol level of 175, would have slurred words, have a difficult time walking, a diminished level of consciousness.  Couture Dep. at 48.

89.    Mr. Kromhout was diagnosed with compartment syndrome as a result of the dog bite and remained hospitalized for four days.  Couture Dep. at 61.

**V.     The Borough of Naugatuck Conducted a Proper Investigation
of This and Other Incidents Related to the Use of K9 Argo.**

90.    Following the incident, Lieutenant Jerry Scully of the Naugatuck conducted an investigation of the incident.  Deeley Dep. at 81.

91.    Lieutenant Scully is Officer Deeley's supervisor.  Deeley Dept at 81.

92.    Lieutenant Scully conducts an investigation every time that the K-9 is utilized.  Deeley Dept at 82.

93.    In connection with that investigation, Officer Deeley submitted a written report summarizing his recollections of the events surrounding Mr. Kromhout's arrest.  Deeley Dep. at 83.

94.    The Borough of Naugatuck has several procedures in place for handling citizen complaints of police misconduct.  Affidavit of Dennis Clisham, dated March 15, 2004, ¶ 5 (attached to Defendants' Motion for Summary Judgment as Exhibit 8).

95.    The Naugatuck Police Department is overseen by a Board of Police Commissioners.  Clisham Aff., ¶ 5.

96.     Typically when a citizen makes a complaint of police misconduct, they are provided with a kit, which details the procedures to be followed in making a complaint.  Clisham Aff., ¶ 6.

97.     Once a civilian complaint is received it is assigned to either Deputy Police Chief Hunt or Captain James Fortin of the Naugatuck Police Department to conduct an internal investigation of the complaint.  Clisham Aff., ¶ 7.

98.     The exact nature of the internal investigation obviously depends on the severity of the complaint.  Clisham Aff., ¶ 8.

99.     At the conclusion of each investigation, a written report is prepared.  Clisham Aff., ¶ 9.

100.     With respect to complaints of excessive use of force, including complaints related to the use of K9 force, I review the report and make a decision whether to forward the complaint to the Board of Police Commissioners.  Clisham Aff., ¶ 10.

101.     The severest complaints are referred to the Board of Police Commissioners.  Clisham Aff., ¶ 11.

102.     During the time that Chief Clisham has been the chief of police, several officers have been disciplined for violations of the Naugatuck Police Department's rules and regulations.  Clisham Aff., ¶ 11.

103.    During that time, the Board of Police Commissioners has conducted several hearings regarding the discipline of officers.  Clisham Aff., ¶ 12.

104.    The discipline imposed upon these officers has followed a progression ranging from verbal warnings, to written warnings, to suspension and discharge.  Clisham Aff., ¶ 13.

RESPECTFULLY SUBMITTED,
DEFENDANTS,
MICHAEL PURCARO, BART DEELEY and the
BOROUGH OF NAUGATUCK

By:_____
    JAMES N. TALLBERG, ESQ.
    Federal Bar Number Ct17849
    MATTHEW FREIMUTH, ESQ.
    Federal Bar Number Ct2524
    UPDIKE, KELLY & SPELLACY, P.C.
    One State Street, P.O. Box 231277
    Hartford, CT 06123-1277
    Tel. No. (860) 548-2600

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed First Class, in the United States mail, postage prepaid, this ___15th___ day of March 2004 to the following:

Steven D. Jacobs, Esq.
Jacobs, Jacobs & Shannon
265 Orange Street.
New Haven, CT 06510

Michael P. McKeon, Esq.
Sullivan, Schoen, Campane &
  Connon, LLC
646 Prospect Avenue
Hartford, CT 06105-4286

By:_____
        JAMES N. TALLBERG, ESQ.
        Updike, Kelly & Spellacy, P.C.

355227                                        17