United States District Court
District of Connecticut
FILED AT    BRIDGEPORT

3/19/04          20
Kevin F. Rowe, Clerk
By: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

DAVID S. KROMHOUT,                    :    CIVIL ACTION NO.
     Plaintiff                        :    3:01-CV-1636 (SRU)
                                      :
v.                                    :
                                      :
RICK R. SMOLICZ, MICHAEL PURCARO,     :
BART DEELEY, and TOWN OF              :
NAUGATUCK,                            :
     Defendants                       :    MARCH 18, 2004

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
### RICK R. SMOLICZ'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 7(a) of the Local Rules of Civil Procedure, the defendant Rick R.

Smolicz, hereby submits this memorandum of law in support of his Motion for Summary

Judgment, which, along with Mr. Smolicz's Local Rule 56(a)(1) Statement, is filed herewith.

With his motion and this memorandum, Mr. Smolicz respectfully requests that this court enter

summary judgment on his behalf with respect to the First Count and the Second Count of the

plaintiff's December 27, 2001 Amended Complaint.  In the First Count, Mr. Smolicz requests

that the court enter summary judgment on the plaintiff's 42 U.S.C. §1981 claim on the ground

that the plaintiff has not alleged nor introduced any evidence that he was subjected to adverse

treatment as a result of his race, national origin or alienage.

Mr. Smolicz additionally asks that summary judgment be entered in his favor on the

plaintiff's claim under 42 U.S.C. §1983 on the ground that the actions or inaction upon which the

LAW OFFICES  •  SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO. 62326

plaintiff predicates his claim do not comprise a violation of the plaintiff's constitutional rights. Furthermore, as to the First Count, the plaintiff's claim for attorney's fees in accordance with 42 U.S.C. §1988 is contingent upon and derivative of his Section 1981 and 1983 claims; thus, the entry of judgment against the plaintiff on those claims similarly extinguishes any right to relief under Section 1988. Finally, although the plaintiff does not specifically allege that Mr. Smolicz violated the Connecticut Constitution, to the extent that such claims can be construed from the Complaint, Mr. Smolicz requests that summary judgment be entered on his behalf.

Mr. Smolicz also moves for summary judgment on the Second Count of the Complaint on the ground that the undisputed evidence clearly establishes that Mr. Smolicz played no role in any purported assault, battery or trespass of the plaintiff.

## I.    UNDISPUTED MATERIAL FACTS

On September 23, 1999, Cynthia Jaschinsky gave a written statement to Officer Michael Purcaro of the Naugatuck Police Department in which she complained that the plaintiff, David Kromhout, had sexually assaulted her on two occasions on September 22, 1999.  9/23/99 C. Jaschinsky Police Statement, a copy of which is appended to the Local Rule 56(a)(1) Statement as Exhibit A.  See also 8/22/02 Deposition of M. Purcaro, the relevant portions of which are appended to the Local Rule 56(a)(1) Statement as Exhibit B, pp. 23-27, 41. Ms. Jaschinsky also stated that earlier that day, September 23, 1999, the plaintiff had physically assaulted her friend,

2

Carmella Liguori, and had threatened Ms. Liguori's family and children. Id.; Id. Ms. Jaschinsky

further warned Officer Purcaro:

> I know what [the plaintiff] has done in the past and it scares me.  [The plaintiff] has told
> me that in the past he murdered his wife, has been arrested for explosives, and has spent
> most of his life in jail.

Exhibit A.

On September 23, 1999, Officer Purcaro completed a police report based upon Cynthia

Jaschinsky's statement.  9/23/99 M. Purcaro Naugatuck Police Department Report, a copy of

which is appended to the Local Rule 56(a)(1) Statement as Exhibit C.  In his report, Officer

Purcaro replicated Ms. Jaschinsky's written statement and added Ms. Jaschinsky's assertion that

the plaintiff had threatened to burn down 48 Washington Street -- the building in which both Ms.

Jaschinsky and Ms. Liguouri lived -- with the children in it, if she filed a complaint with the

police. Id., p. 2.  See also 12/27/01 Amended Complaint, ¶¶3, 5.  Rick Smolicz, then a Sergeant

with the Naugatuck Police Department, co-signed Officer Purcaro's report and took photographs

of the bruises that Ms. Jaschinsky reported she had suffered during her assault by the plaintiff.

Exhibit C, pp. 1, 2, 3.

Subsequent to receiving Ms. Jaschinsky's statement, Sgt. Smolicz entered the plaintiff's

name into the NCIC computer, which indicated that the plaintiff was considered armed and

dangerous and was wanted in New York for parole violation.  R. Smolicz Testimony, 6/16/00

Connecticut Superior Court Hearing on Motion to Suppress, the relevant excerpts of which are

3

appended to the Local Rule 56(a)(1) Statement as Exhibit D, pp. 7-8.  Upon further investigation,

Sgt. Smolicz also discovered that on November 2, 1998, the plaintiff's New York parole officer,

George Benjes, had reported the plaintiff "to be extremely violent with police officers and

known to have weapons and explosives on his person (Use extreme caution)."  9/23/99 R.

Smolicz Naugatuck Police Department Report, a copy of which is appended to the Local Rule

56(a)(1) Statement as Exhibit E, p. 2.  See also 9/12/02 Deposition of R. Smolicz, the relevant

excerpts of which are appended to the Local Rule 56(a)(1) Statement as Exhibit F, pp. 78, 95.

On the evening of September 23, 1999, the police received a complaint from Carmella

Liguori's mother that the plaintiff had assaulted Ms. Liguori.  Exhibit D, R. Smolicz Test., pp. 9-

11.  In response to the complaints that had been made, Sgt. Smolicz summoned other police

officers, including co-defendants Michael Purcaro and Bart Deeley, in order to locate the

plaintiff and Ms. Liguori and to check on Ms. Liguori's welfare.  Exhibit E, p. 2.  See also

Exhibit D, R. Smolicz Test., p. 11; Exhibit F, pp. 93-95.  Based upon the complaints and

information they had received, the officers believed that the plaintiff was extremely dangerous

and should be approached with caution.  Exhibit B, pp. 39-41.

On the evening of September 23, 1999, Sgt. Smolicz, Officer Purcaro, Officer Deeley and

Officer Marc O'Meara went to Ms. Liguori's home at 48 Washington Street in Naugatuck,

looking for the plaintiff.  Exhibit D, R. Smolicz Test., pp. 12-13.  The police established a

perimeter around the residence, with Officers Deeley and O'Meara located in the back of the

4

residence and Sgt. Smolicz and Officer Purcaro approaching the front door. Id. Sgt. Smolicz knocked on the door. Exhibit F, p. 97; Exhibit B, p. 48. The plaintiff opened the door approximately ten inches. 8/13/02 Deposition of D. Kromhout, the relevant excerpts of which are appended to the Local Rule 56(a)(1) Statement as Exhibit G, pp. 84, 99. See also Exhibit D, p. 14. While the door was open, Sgt. Smolicz believed that he saw the plaintiff holding a knife alongside his leg. Exhibit F, pp. 104-105. Sgt. Smolicz also saw Ms. Liguori standing behind the plaintiff in the kitchen; her face was puffy and she was crying. Id., pp. 104-106.

The plaintiff appeared stunned, was sweating profusely and was breathing heavily. Exhibit D, R. Smolicz Test., p. 15. As soon as Sgt. Smolicz made eye contact with the plaintiff, the plaintiff closed and locked the main door. Exhibit G, p. 100. Sgt. Smolicz had not said anything before the plaintiff closed the door. Id., pp. 100, 102. The closest that Sgt. Smolicz came to the plaintiff was three-to-four feet. Id., p. 102.

After the plaintiff closed the door, he told Ms. Liguori that the police were at the door and that he was leaving. Exhibit G, p. 110. Within "7.2 seconds" of closing the door, the plaintiff had hidden himself under a king-sized bed in the master bedroom of the apartment. Exhibit G, pp. 103, 112, 130. The light was off in the bedroom in which the plaintiff was hiding. Id., p. 108. The plaintiff was attempting to get away from the police because he was in violation of his parole. Exhibit D, C. Liguori Test., pp. 69-70; Exhibit G, p. 115.

5

The police knocked on the door and asked for someone to open it. Exhibit D, C. Liguori Test., p. 59. Ms. Liguori opened the door within approximately ten-to-fifteen seconds. Exhibit D, R. Smolicz Test., p. 18; Exhibit B, p. 53; Exhibit E, p. 2. Ms. Liguori let the police into the apartment. Exhibit D, C. Liguori Test., p. 70; Exhibit G, p. 153. When Ms. Liguori opened the door for the police, they asked her for the plaintiff's whereabouts; Ms. Liguori stated that the plaintiff had fled "out the back door." Exhibit G, pp. 109, 111; Exhibit D, C. Liguori Test., pp. 71, 73. The police then entered the apartment. Exhibit D, C. Liguori Test., p. 73.

The police in the apartment spoke with the officers who had been stationed outside the back of the apartment and were told that the plaintiff had not exited. Exhibit G, p. 109; Exhibit F, p. 117. The officers conducted a cursory search of the apartment, shouting for the plaintiff to come out of hiding, but they did not find the plaintiff. Exhibit F, pp. 117-18. See also Exhibit E, p. 2. Believing the plaintiff posed an extreme danger to others, was wanted for felony charges and posed a flight risk, Sgt. Smolicz requested consent from Ms. Liguori for a K-9 search of her apartment. Exhibit E, p. 3. Sgt. Smolicz did so even though due to the plaintiff's flight risk he did not believe it was necessary. Id. In response, Ms. Liguori whispered to Sgt. Smolicz: "'If he hears me tell you yes, he'll kill me, just get him out of here.'" Id.

Consequently, Sgt. Smolicz requested that Officer Deeley and his canine partner, Argo, enter the apartment. Exhibit E, p. 3; Exhibit F, p. 119. See also 12/27/01 Amended Complaint, ¶ 7; 1/28/02 Answer and Affirmative Defenses to Plaintiff's Amended Complaint, ¶ 7. At that

6

time, Sgt. Smolicz informed Officer Deeley that the plaintiff was armed with a knife.  8/22/02

Deposition of B. Deeley, the relevant excerpts of which are appended hereto as Exhibit H, p. 61.

At the time of the plaintiff's September 23, 1999 arrest, the Naugatuck Police

Department ["the Department"] had implemented standard procedures regarding the use of

canines that Sgt. Smolicz was required to follow.  3/12/04 Affidavit of Rick Smolicz, a copy of

which is appended to the Local Rule 56(a)(1) Statement as Exhibit I, ¶9.  See also 12/12/90

Departmental Order Re:  Canine Unit, a copy of which is appended to the Local Rule 56(a)(1)

Statement as Exhibit J.  On various occasions prior to September 23, 1999, Sgt. Smolicz had

been present when canine handlers reviewed the policies and procedures regarding the use of

canines, which reviews were usually done during roll call.  Exhibit I, ¶10.  Furthermore, on

various occasions prior to September 23, 1999, Sgt. Smolicz had personally consulted with

canine handlers to ensure that he had a clear understanding of the Departmental procedures that

he and the other officers were required to follow when the canines were utilized.  Id., ¶11.

The Department's policies noted that the "Canine Unit has been established to provide

highly trained teams (Dog and Handler) to assist in all relevant aspects of police work."  Exhibit

J, p. 1, Introduction.  One of these aspects of police work was "[l]ocating and apprehending

suspects."  Id., ¶2. Under the Department's procedures and practices governing the use of

canines:

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

> Canine deployment is the responsibility of the canine handler. A canine handler best knows the capabilities and limitations of his dog and is trained in tactical canine deployment situations. Supervisors should consider any advice relating to the deployment of a canine offered by the handler.

Exhibit J, p. 3, ¶5. As a member of the Canine Unit and Argo's handler, Officer Deeley had the sole authority under Departmental policy to determine whether and in what manner Argo would be deployed in effectuating the plaintiff's apprehension. Exhibit I, ¶ 8. Sgt. Smolicz was not a member of the Canine Unit. Exhibit I, ¶ 5. Sgt. Smolicz had no supervisory authority over the manner and method in which Officer Deeley deployed his canine partner, Argo, nor did he control or give commands to Argo. Id., ¶¶6, 7.

Departmental policy provides that when a canine is to be deployed, "[t]he responding officers should seal off the surrounding area and not enter the area to be searched." Exhibit J, p. 7, Building Searches. See also Exhibit I, ¶12. On September 23, 1999, the plaintiff heard one of the police officers instruct another officer: "Remove [Ms. Liguori] from the house. She has to get out of the house. We are bringing the K-9 in." Exhibit G, p. 111. Departmental policy further provides: "During the search the canine handler should be accompanied by another officer and this officer should follow any instructions given to him by the canine handler." Exhibit J, p. 7, Building Searches. See also Exhibit I, ¶14. On September 23, 1999, the plaintiff heard Officer Deeley order other officers to stay in the kitchen and keep the kitchen area secured. Exhibit G, p. 111. See also Exhibit F, p. 120.

8

Departmental policy provides: "The canine handler will announce his intent to release the dog for a search, and will allow the suspect a reasonable amount of time to come out of hiding and give himself up." Exhibit I, p. 7, Building Searches. On September 23, 1999, the plaintiff heard Officer Deeley give the following warning: "Come on out with your hands up . . . . Police with K-9. Come out with your hands up." Exhibit G, p. 109. Between thirty seconds and two minutes later, the plaintiff heard Officer Deeley repeat himself: "Police with K-9. Come out with your hands up." Id. See also Exhibit F, pp. 119-20; Exhibit H, pp. 63, 79; 1/7/03 Deposition of M. O'Mara, the relevant excerpts of which are appended to the Local Rule 56(a)(1) Statement as Exhibit K, p. 87.

Departmental policy provides: "During a building search the canine works off leash and if the suspect is found he may be bitten when apprehended by the canine." Exhibit J, p. 7, Building Searches. See also Exhibit H, p. 68. When the plaintiff did not respond to Officer Deeley's warnings, Officer Deeley dropped Argo's leash, which was the signal he used to direct Argo to seek and apprehend the plaintiff. Exhibit H, p. 64.

According to the plaintiff, Argo approached him "apprehensively, like he didn't come viciously to rip me apart to bite." Exhibit G, p. 134. In fact, the plaintiff admitted that Argo did not bite him until the plaintiff tried to pull himself away from the canine. Exhibit G, p. 134. Argo then attempted to apprehend the plaintiff by biting and holding the suspect. Exhibit H, p. 68. The plaintiff further testified that Argo's bites "weren't deep, gouging bites. They were just

9

like hard nips that broke the skin." Exhibit G, p. 135. When Argo clamped the plaintiff's thigh, however, the plaintiff grabbed Argo's snout with both hands and fought him off. Id.

Officer Deeley heard what sounded like fighting coming from the bedroom. Exhibit H, pp. 65, 66-67. See also Exhibit F, pp. 122-24. When Office Deeley arrived at the bedroom door, Argo was already underneath the bed where the plaintiff was hiding. Exhibit H, p. 67. Officer Deeley ordered the plaintiff to come out from underneath the bed. Exhibit F, pp. 123-24. When the plaintiff did not do so, Officer Deeley and Officer O'Mara turned over the mattress and the box spring of the bed. Exhibit F, p. 124; Exhibit H, p 67; Exhibit K, pp. 68, 75.

If an individual does not resist, canines such as Argo are trained simply to bite and hold, and there is only one set of bite marks. Exhibit H, p. 89. If an individual resists and fights the dog, however, the canine will generally continue to try and get the best grip it can in order to hold him. Id. Officer Deeley informed the plaintiff that if he stopped resisting, Officer Deeley would call off Argo, but the plaintiff continued to struggle with the canine. Id., pp. 67 68; Exhibit K, pp. 70-71. Officer Deeley then spotted a knife on the floor. Exhibit H, pp. 67, 68-69. Sgt. Smolicz also saw it, as did Officer Purcaro and Officer O'Mara. Exhibit F, pp. 124-127; Exhibit B, p. 84. See also Exhibit K, p. 69. Upon seeing the knife, Officer Deeley "football tackled" the plaintiff. Exhibit H, p. 67.

K-9 officers such as Argo are trained to bite a suspect when there is an altercation with the canine's handler. Exhibit J, p. 8, Handler Protection. When Officer Deeley "tackled" and

10

wrestled with the plaintiff, Argo continued to bite the plaintiff. Exhibit H, p. 68. Officer Deeley ordered Argo to withdraw immediately upon securing one of the plaintiff's wrists in handcuffs. Id., pp. 70-71. See also Exhibit B, p. 68; Exhibit K, pp. 72-73. The September 23, 1999 incident involving the plaintiff was the only time that Argo had bitten an individual in more than one spot. Exhibit H, pp. 89-90.

The entire incident involving Argo and the plaintiff lasted no more than ten-to-fifteen seconds. Exhibit B, p. 66; Exhibit H, p. 70. According to Officer Deeley, it happened "in the blink of an eye." Exhibit H, p. 71. See also Exhibit K, p. 88. The plaintiff was the first individual that Sgt. Smolicz had seen resist a canine rather than immediately surrender. Exhibit F, pp. 128-29. According to the police officers, the plaintiff was punching Argo. Exhibit F, pp. 127-29; Exhibit H, pp. 67-68; Exhibit K, pp. 69, 72, 88. Argo had a tooth ripped out, requiring oral surgery, and his rear legs were also injured. Exhibit H, pp. 41, 87; Exhibit F, pp. 127-29.

Departmental policy notes that if there is an altercation involving the handler, "assisting officers should stand back and wait for instructions from the canine handler. The canine may bite officers coming to assist." Exhibit J, p. 8, Handler Protection. See also Exhibit B, p. 82; Exhibit H, pp. 75-76; Exhibit K, pp. 82-83. Departmental policy further underscores the importance of assisting officers keeping a distance from the canine and its handler:

> In the event the canine handler is injured and the canine is not secured, use extreme caution in the approach of the handler. The canine may take the approach of assisting personnel as a threat and defend the handler by way of an attack as he is trained to do.

11

Exhibit J, p. 11, Injured Canine Handler. <u>See</u> <u>also</u> Exhibit I, ¶15. Similarly, Departmental policy directs: "Personnel will not interfere with the canine team and their objective." Exhibit J, p. 12, General Rules and Conduct, ¶6. <u>See</u> <u>also</u> Exhibit I, ¶13.

In accordance with Departmental policy, during the events of September 23, 1999, Sgt. Smolicz maintained a safe distance from Argo until Officer Deeley commanded Argo to withdraw. Exhibit I, ¶16. Sgt. Smolicz was approximately ten-to-twelve feet away from where Officer Deeley, Argo and the plaintiff were. Exhibit B, p. 65. Sgt. Smolicz did not participate in Officer Deeley's attempts to restrain the plaintiff. Exhibit H, p. 75, 77; Exhibit B, p. 66; Exhibit K, pp. 73-74. When the plaintiff finally surrendered, Officer Deeley handcuffed plaintiff with the assistance of Officer Purcaro. Exhibit H, p. 71.

At no point during the events leading up to, including and following the plaintiff's arrest on September 23,1999 did Sgt. Smolicz strike the plaintiff or use any force whatsoever on him. Furthermore, at no point during the events leading up to, including and following the plaintiff's arrest did he threaten to strike or use force on him. Exhibit I, ¶18. The plaintiff has not alleged that Sgt. Smolicz struck or threatened to strike him. 12/27/01 Amended Complaint.

At the time of the plaintiff's arrest, a knife was seized from under the same bed under which the plaintiff had been hiding. Exhibit H, pp. 69, 91. Following his arrest, the plaintiff was violent and non-compliant when Officer O'Mara took him to the police station. Exhibit K, pp.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

77-78. The plaintiff was subsequently taken by ambulance from the police station to St. Mary's Hospital, where the hospital admission records characterized him as uncooperative and combative. 12/18/03 Deposition of Dr. Alan Couture, the relevant excerpts of which are appended to the Local Rule 56(a)(1) Statement as Exhibit L, pp. 50-51. Laboratory results of plaintiff's blood sample taken within two hours of his arrest indicated a blood alcohol level of .119 mg/dl. Id., pp. 45-46. The plaintiff had no trauma either to the head or to the torso, nor did he have any broken bones, fractures or dislocations. Id., pp. 52-53. In fact, the plaintiff's only medical complaint was a dog bite. Id., p. 52.

According to the plaintiff, on September 23, 1999 he had, in fact, physically assaulted Carmella Liguori after a verbal dispute, testifying that he had "kicked her in the ass." Exhibit G, p. 72.

On June 16 and 19, 2000, The Honorable William Cremins, Judge of the Connecticut Superior Court, held hearings on the plaintiff's Motion to Suppress in his criminal prosecution. Exhibit D. Prior to that hearing, the plaintiff's counsel had had open access to the State's file. Id., 6/19/00 Hearing, p. 8. Furthermore, at that hearing, the plaintiff was permitted to call witnesses on his behalf. Id., 6/19/00 Hearing, pp. 23-26, et al. The plaintiff was also permitted to cross-examine the witnesses called by the State. Id., 6/17/00 Hearing. Subsequently, on June 21, 2000, The Honorable William Cremins, Judge of the Connecticut Superior Court, denied the plaintiff's Motion to Suppress. 6/21/00 Transcript of Hearing on Motion to Suppress, a copy of

13

which is appended to the Local Rule 56(a)(1) Statement as Exhibit M.  In denying the plaintiff's

Motion to Suppress, Judge Cremins held:

> The Court concludes that under the – totality of the circumstances, the police had reasonable grounds to enter the apartment to effect a valid arrest based on exigent circumstances and a reasonable belief that an emergency existed.

Id., pp. 7-8.  Judge Cremins further noted that Ms. Liguori had testified that she had opened the

door and let the police into the apartment.  Id., p. 3.

## II.    LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be

granted when the moving party sustains its burden of showing that there is no genuine issue as to

any material fact and that it is entitled to judgment as a matter of law.  See also Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  In considering the appropriateness of summary judgment, the

United States Supreme Court has held: "Summary judgment procedure is properly regarded not as

a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil

Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination

of every action.'"  Celotex Corp. v. Catrett, 477 U.S. at 327 (citing Fed. R. Civ. P. 1).  In adjudging a

motion for summary judgment, the "mere existence of factual issues -- where those issues are not

material to the claims before the court -- will not suffice to defeat a motion for summary judgment."

Quarles v. General Motors Corp., 758 F.2d 839, 840 (2nd Cir. 1985).

14

While it is true that "[i]f the party opposing summary judgment 'generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate,'" National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 203 (2nd Cir. 1989)(quoting Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 762 (2nd Cir. 1983)), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Consequently, neither "conclusory statements, conjecture, [n]or speculation" will suffice to defeat summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2nd Cir. 1996). Similarly, "[m]etaphysical doubt, conjecture, or surmise cannot . . . defeat the motion." Halpern v. Federal Bureau of Investigation, 181 F.3d 279, 287 (2nd Cir. 1999). In short, it is well established "that a summary judgment motion cannot be defeated by conclusory allegations, harsh invective, empty rhetoric, strained inferences, or unsupported conjecture. Collier v. City of Chicopee, 158 F.3d 601, 604 (1st Cir. 1998) (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990)).

Even when the underlying events in a case are not in genuine dispute, but the characterization and application of a legal test are disputed, the contested issue may still be ripe for adjudication by way of summary judgment. Newell Companies, Inc. v. Kenney Manufacturing Company, 864 F.2d 757, 763 (Fed. Cir. 1988), cert denied, 493 U.S. 814, 110 S.Ct. 62 (1989).

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

In the analogous context of deciding a motion for judgment pursuant to Rule 50 of the Federal Rules of Civil Procedure, the United States Supreme Court has held that when "entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097, 2110 (2000). In other words, "the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" 120 S. Ct. at 2110 (quoting 9A C, Wright & A. Miller, *Federal Practice and Procedure* §2529, p. 300 (2d ed. 1995)).

## III.    LEGAL ARGUMENT

### A.    The Plaintiff Has Failed To Establish A Claim Under 42 U.S.C §1981.

In the First Count of the Complaint, the plaintiff alleges in relevant part that "Officers Smolicz, Purcaro, and Deeley acted in concert to deprive David Kromhout of the rights, privileges and immunities secured to him by Title 42 of the United States Code, Sections 1981." 12/27/01 Amended Complaint, ¶19. Section 1981 provides in relevant part:  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed *by white citizens*." 42 U.S.C. §1981(a)(emphasis added). Given Section 1981's plain and unambiguous language, it is commonly accepted that Section 1981 is intended to "address

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

intentional discrimination based on race or color." Hockaday v. Texas Dept. of Criminal Justice, 914 F. Supp. 1439 (S.D. Tx. 1996). See also Jett v. Dallas Indep. Sch. Dist., 798 F.2d 748, 762 (5th Cir. 1986), *modified on other grounds*, 491 U.S. 701, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1987)("[S]ection 1981 provides a cause of action for public or private discrimination based on race or alienage").

In Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085 (2nd Cir. 1993), the Second Circuit held:

> To establish a claim under §1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e. make and enforce contracts, sue and be sued, give evidence, etc.).

Id., at 1087. "Thus, section 1981 is . . . narrower [than 42 U.S.C. §1983] in that it *only* provides a remedy for discrimination based on race or alienage." Jett, 798 F.2d at 762 (emphasis added). See also McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 96 S. Ct. 2574, 49 L.Ed.2d 493 (1976); Hockaday, 914 F. Supp. at 1445 (defendants entitled to summary judgment because "42 U.S.C. §1981 address intentional discrimination based on race or color, but Hockaday's complaint is devoid of any mention of such discrimination"); Kelley v. City of Mesa, 873 F. Supp. 320, 331 (D. Az. 1994)("Because Plaintiff does not present any proper evidentiary material showing that she was terminated because of her race or national origin, Defendants are entitled to summary judgment on Plaintiff's §1981 claim").

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

In the present case, there are absolutely no allegations whatsoever that the plaintiff was discriminated against on the basis of his race, color or alienage, nor is there any evidence that would support such a claim. In short, the plaintiff fails to satisfy the most essential requisite for bringing an action under 42 U.S.C. §1981, and summary judgment must enter on behalf of Mr. Smolicz.[1]

**B.      The Plaintiff Has Failed To Establish A Claim Under 42 U.S.C. §1983.**

In the First Count, the plaintiff further alleges: "Officers Smolicz, Purcaro, and Deeley acted in concert to deprive David Kromhout of the rights, privileges and immunities secured to him by Title 42 of the United States Code, Sections . . . 1983 and 1988." 12/27/01 Amended Complaint, ¶19. With respect to Mr. Smolicz, the plaintiff predicates his Section 1983 claim upon his assertion that Mr. Smolicz "failed to intervene to prevent Mr. Kromhout from being attacked and maimed by Argo and thereby being subjected to the use of excessive force." Id., ¶18. In short, the plaintiff bases his Section 1983 claim against Mr. Smolicz upon the latter's alleged inaction. This is in contrast to his allegation that Officer Deeley purportedly violated the plaintiff's rights due to Officer Deeley's *actions*, specifically "permitting Argo to attack and maim Mr. Kromhout . . . [and using] excessive force in apprehending Mr. Kromhout and placing him under arrest."

The Second Circuit has recognized that "[p]olice officers 'have an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in their presence

---

[1]Even if the plaintiff *had* alleged discrimination, given the third required element for stating a claim under Section 1981 that was articulated by the Second Circuit in Mian, the actions or inaction alleged by the plaintiff against Mr. Smolicz do

18

by other officers.'" <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11 (2nd Cir. 1988), *quoted in* <u>Jones v. City</u>

<u>of Hartford</u>, 285 F. Supp.2d 174, 182 (D. Conn. 2003).  Consequently:

> "An officer who fails to intercede is liable for the preventable harm caused by the actions of
> the other officers where that officer observes or has reason to know:  (1) that excessive force
> is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional
> violation has been committed by a law enforcement official."

<u>Jones</u>, 285 F. Supp.2d at 182 (quoting <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2nd Cir. 1994)).  Thus,

in order to hold a police officer liable for failing to intervene, the plaintiff must establish one of

these three circumstances.  Additionally, the plaintiff is obligated to prove that the officer "'had a

realistic opportunity to intervene to prevent the harm from occurring.'"  <u>Jones</u>, 285 F. Supp.2d at

182 (quoting <u>Anderson</u>, 17 F.3d at 557).

**1.    Excessive Force Was Not Used.**

Although the plaintiff alleges in his Amended Complaint that Officer Deeley used excessive

force by "permitting Argo to attack and maim Mr. Kromhout," the undisputed material facts do not

support his contention.  Contrary to the plaintiff's allegation that Officer Deeley permitted "Argo to

attack" him, during his deposition the plaintiff testified that Argo approached him "apprehensively,

like he didn't come viciously to rip me apart to bite."  Exhibit G, p. 134.  In fact, the plaintiff

admitted that Argo did not bite him *until* the plaintiff tried to pull himself away from the canine.

Exhibit G, p. 134.

---

not fall within the scope of Section 1981.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

The Naugatuck Police Department ["Department"] policy regarding the use of canines provides: "During a building search the canine works off leash and if the suspect is found he may be bitten when apprehended by the canine." Exhibit J, p. 7, Building Searches. See also Exhibit H, p. 68. In accordance with that policy, when the plaintiff attempted to pull himself away from Argo, the canine sought to apprehend the plaintiff by biting and holding him. Exhibit H, p. 68. Furthermore, as the plaintiff acknowledges, Argo was not even released until Officer Deeley had twice provided notice that he had a canine. Exhibit G, p. 109. See also Exhibit F, pp. 119-20; Exhibit H, pp. 63, 79; Exhibit K, p. 87.

According to the police officers on the scene, once Argo attempted to apprehend the plaintiff, the plaintiff began punching Argo. Exhibit F, pp. 127-29; Exhibit H, pp. 67-68; Exhibit K, pp. 69, 72, 88. The plaintiff asserts that he did not strike Argo, claiming instead that when Argo clamped his thigh, he merely grabbed Argo's snout with both hands and fought him off. Exhibit G, p. 135. See also Amended Complaint, ¶13. Regardless of how the plaintiff characterizes his response to the canine's attempts to apprehend him, it is undisputed that Argo had a tooth ripped out, requiring oral surgery, and his rear legs were also injured. Exhibit H, pp. 41, 87; Exhibit F, pp. 127-29.

Officer Deeley testified that if an individual does not resist, canines such as Argo are trained simply to bite and hold, and there is only one set of bite marks. Exhibit H, p. 89. If an individual resists and fights the dog, however, Officer Deeley stated that the canine will

20

generally continue to try and get the best grip it can in order to hold him. Id. Officer Deeley informed the plaintiff that he would call off Argo if the plaintiff simply stopped resisting, but the plaintiff continued to struggle with the canine. Id., pp. 67 68; Exhibit K, pp. 70-71. As noted, the plaintiff admits that, at the very least, he grabbed Argo's snout. Exhibit G, p. 135. Sgt. Smolicz testified that the plaintiff was the first individual whom he had seen resist a canine rather than quickly surrender, and, not surprisingly, this was the only time that Argo had bitten an individual in more than one spot. Exhibit F, pp. 128-29; Exhibit H, pp. 89-90.

Officer Deeley testified that he spotted a knife on the floor. Exhibit H, pp. 67, 68-69. Sgt. Smolicz also saw it, as did Officer Purcaro and Officer O'Mara. Exhibit F, pp. 124-127; Exhibit B, p. 84; Exhibit K, p. 69. Upon seeing the knife, Officer Deeley "football tackled" the plaintiff. Exhibit H, p. 67. K-9 officers such as Argo are trained to bite a suspect when there is an altercation with the canine's handler. Exhibit J, p. 8, Handler Protection. Consequently, when Officer Deeley "tackled" and wrestled with the plaintiff, Argo continued to bite the plaintiff. Exhibit H, p. 68. As soon as Officer Deeley was able to secure one of the plaintiff's wrists in handcuffs, however, he immediately ordered Argo to withdraw. Exhibit H, pp. 70-71. See also Exhibit B, p. 68; Exhibit K, pp. 72-73.

Although in his Amended Complaint the plaintiff asserts that Office Deeley permitted "Argo to . . . maim" him, Id., ¶17, at his deposition the plaintiff testified that Argo's bites "weren't deep, gouging bites. They were just like hard nips that broke the skin." Exhibit G, p.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

135.   According to Dr. Alan Coutoure, the emergency room doctor at St. Mary's Hospital, to

which the plaintiff was brought by the Department, there was no evidence of trauma either to the

plaintiff's head or to his torso.  Exhibit L, pp. 52.  Furthermore, the plaintiff had no broken

bones, fractures or dislocations.  Id., p. 53.  The plaintiff's only medical complaint was dog bite.

Id., p. 52.[2]

   Given the undisputed facts, including the plaintiff's own admissions, there is no factual

support for the plaintiff's allegations that Officer Deeley "used excessive force" and thus the

plaintiff is unable to satisfy the first element regarding the duty to intercede that the Second

Circuit set forth in Anderson.

   **2.    The Plaintiff's Arrest Was Justified.**

   The First Count contains no specific allegation that the plaintiff's arrest on September 23,

1999 was unjustified.  Amended Complaint, ¶¶1-19.  Even if the plaintiff had included such an

allegation, the Second Circuit has held:  "A §1983 claim of false arrest based on the Fourth

Amendment right to be free from unreasonable seizures may not be maintained if there was

probable cause for the arrest."  Kent v. Katz, 312 F.3d 568, 573 (2nd Cir. 2002).  See also Singer

---

[2]Dr. Couture's testimony stands in sharp contrast to the laundry list of physical trauma the plaintiff alleges he
purportedly suffered as the result of his apprehension on the September 23, 1999.  Amended Complaint, ¶14.  For
example, although the plaintiff alleges that he had "severe bruises and contusions to the head, face, and ears," Dr.
Couture testified that the plaintiff had no trauma to his head and torso.  Id.; Exhibit L, pp. 52, 53.  It is also
instructive to consider that although the plaintiff had no trauma nor any breaks, fractures or dislocations, Argo, in
sharp contrast, had a tooth ripped out, requiring oral surgery, and his rear legs were also injured.  Exhibit H, pp. 41,
87; Exhibit F, pp. 127-29.

22

LAW OFFICES  •  **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC**  •  646 PROSPECT AVENUE  •  HARTFORD, CONNECTICUT 06105-4286  •  (860) 233-2141
JURIS NO.  62326

v. Fulton County Sheriff, 63 F.3d 110, 118 (2nd Cir. 1995), *cert. denied*, 517 U.S. 1189, 116 S.

Ct. 1676, 134 L.Ed.2d 779 (1996)("There can be no federal civil rights claim for false arrest

where the arresting officer had probable cause").  In the present case, the Connecticut Superior

Court already determined that the plaintiff's arrest was, in fact, justified.  On June 21, 2000,

Judge William Cremins of the Connecticut Superior Court held:

> The Court concludes that under the – totality of the circumstances, the police had reasonable grounds to enter the apartment to effect a valid arrest based on exigent circumstances and a reasonable belief that an emergency existed.

Exhibit M, pp. 7-8. Judge Cremins' decision followed two evidentiary hearings on the plaintiff's

Motion to Suppress. Id., p. 2. See also Exhibit D.

Federal courts are required to "give a state-court judgment the same preclusive effect as

would be given that judgment under the law of the State in which the judgment was rendered."

Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 896, 79 L.Ed.2d

56 (1984)(citing 28 U.S.C. §1738).  "This rule applies to determine the preclusive effect of a

state court judgment on a subsequent suit in federal court brought pursuant to §1983." Golino v.

City of New Haven, 950 F.2d 864, 869 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221, 112 S. Ct.

3032, 120 L.Ed.2d 902 (1992).  Nonetheless, "'[c]ollateral estoppel does not apply where the

party against whom an earlier court decision is asserted did not have a full and fair opportunity to

litigate the claim or issue decided by the first court.'" Id. (quoting Allen v. McCurry, 449 U.S.

90, 101, 101 S. Ct. 411, 418, 66 L.Ed.2d 308 (1980)).

23

In <u>Golino</u>, the Second Circuit declined to apply collateral estoppel to a state-court hearing on a suppression motion. 950 F.2d at 869-70. The court based its decision upon the fact that in that case the plaintiff was not permitted to call any witnesses in the suppression hearing, nor had he been provided with access to the police investigative file. <u>Id.</u> In the present case, however, the plaintiff was permitted to call witnesses to testify on his behalf. Exhibit D, 6/19/00 Hearing, pp. 23, 25-26. Furthermore, during the suppression hearing, the Judge Cremins and the plaintiff's attorney – who is also representing him in the present matter – held the following colloquy:

> THE COURT: Well counsel, let me ask you this. Have you had open access to the State's file?
>
> MR. JACOBS: I have had open access.

<u>Id.</u>, p. 8. In short, the elements that are essential for giving preclusive effect to the Connecticut Superior Court's decision were present in this case, and thus, the plaintiff is collaterally estopped from asserting a purportedly unjust arrest as a basis for his Section 1983 claim. <u>See</u> <u>Coogan v. City of Wixom</u>, 820 F.2d 170, 175 (6th Cir. 1987)(state-court finding of probable cause given preclusive effect in subsequent §1983 action as plaintiff had opportunity to call witnesses and cross-examine witnesses, thereby providing him with a full and fair opportunity to litigate probable cause issue)(cited in <u>Golino</u>, 950 F.2d at 869). In short, the plaintiff cannot satisfy the second element relating to the duty to intercede that is contained in <u>Anderson</u>.

*LAW OFFICES* • **SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC** • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326