FILED

2004 MAR 19 A 11:09

U.S. DISTRICT COURT
BRIDGEPORT, CONN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID S. KROMHOUT, | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:01-CV-1636 (SRU) |
| | : | |
| v. | : | |
| | : | |
| RICK R. SMOLICZ, MICHAEL PURCARO, | : | |
| BART DEELEY, and TOWN OF | | |
| NAUGATUCK, | : | |
| Defendants | : | MARCH 17, 2004 |

### DEFENDANT RICK R. SMOLICZ'S LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Rule 56(a)(1) of the Local Rules of Civil Procedure, the defendant, Rick R. Smolicz, hereby sets forth the following statement of material facts that are not in dispute.

1. On September 23, 1999, Cynthia Jaschinsky gave a written statement to Officer Michael Purcaro of the Naugatuck Police Department in which she complained that the plaintiff, David Kromhout, had sexually assaulted her on two occasions on September 22, 1999. 9/23/99 C. Jaschinsky Police Statement, a copy of which is appended hereto as Exhibit A. See also 8/22/02 Deposition of M. Purcaro, the relevant portions of which are appended hereto as Exhibit B, pp. 23-27, 41. Ms. Jaschinsky also stated that earlier that day, September 23, 1999, the plaintiff had physically assaulted her friend, Carmella Liguori, and had threatened Ms. Liguori's family and children. Id.; Id. Ms. Jaschinsky further warned Officer Purcaro:

> I know what [the plaintiff] has done in the past and it scares me. [The plaintiff] has told me that in the past he murdered his wife, has been arrested for explosives, and has spent most of his life in jail.

Exhibit A.

2. On September 23, 1999, Officer Purcaro completed a police report based upon Cynthia Jaschinsky's statement. 9/23/99 M. Purcaro Naugatuck Police Department Report, a copy of which is appended hereto as Exhibit C. In his report, Officer Purcaro replicated Ms. Jaschinsky's written statement and added Ms. Jaschinsky's assertion that the plaintiff had threatened to burn down 48 Washington Street -- the building in which both Ms. Jaschinsky and Ms. Liguouri lived -- with the children in it, if she filed a complaint with the police. Id., p. 2. See also 12/27/01 Amended Complaint, ¶¶3, 5. Rick Smolicz, then a Sergeant with the Naugatuck Police Department, co-signed Officer Purcaro's report and took photographs of the bruises that Ms. Jaschinsky reported she had suffered during her assault by the plaintiff. Exhibit C, pp. 1, 2, 3.

3. Subsequent to receiving Ms. Jaschinsky's statement, Sgt. Smolicz entered the plaintiff's name into the NCIC computer, which indicated that the plaintiff was considered armed and dangerous and was wanted in New York for parole violation. R. Smolicz Testimony, 6/16/00 Connecticut Superior Court Hearing on Motion to Suppress, the relevant excerpts of which are appended hereto as Exhibit D, pp. 7-8.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

4.     Upon further investigation, Sgt. Smolicz also discovered that on November 2, 1998, the plaintiff's New York parole officer, George Benjes, had reported the plaintiff "to be extremely violent with police officers and known to have weapons and explosives on his person (Use extreme caution)." 9/23/99 R. Smolicz Naugatuck Police Department Report, a copy of which is appended hereto as Exhibit E, p. 2. See also 9/12/02 Deposition of R. Smolicz, the relevant excerpts of which are appended hereto as Exhibit F, pp. 78, 95.

5.     Later in the day on September 23, 1999, the police received a complaint from Carmella Liguori's mother that the plaintiff had assaulted Ms. Liguori. Exhibit D, R. Smolicz Test., pp. 9-11.

6.     In response to the complaints that had been made, Sgt. Smolicz summoned other police officers, including co-defendants Michael Purcaro and Bart Deeley, in order to locate the plaintiff and Ms. Liguori and to check on Ms. Liguori's welfare. Exhibit E, p. 2. See also Exhibit D, R. Smolicz Test., p. 11; Exhibit F, pp. 93-95. Based upon the complaints and information they had received, the officers believed that the plaintiff was extremely dangerous and should be approached with caution. Exhibit B, pp. 39-41.

7.     On the evening of September 23, 1999, Sgt. Smolicz, Officer Purcaro, Officer Deeley and Officer Marc O'Meara went to Ms. Liguori's home at 48 Washington Street in Naugatuck, looking for the plaintiff. Exhibit D, R. Smolicz Test., pp. 12-13. The police

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

established a perimeter around the residence, with Officers Deeley and O'Meara located in the back of the residence and Sgt. Smolicz and Officer Purcaro approaching the front door. Id.

8. Sgt. Smolicz knocked on the door. Exhibit F, p. 97; Exhibit B, p. 48. The plaintiff opened the door approximately ten inches. 8/13/02 Deposition of D. Kromhout, the relevant excerpts of which are appended hereto as Exhibit G, pp. 84, 99. See also Exhibit D, p. 14. While the door was open, Sgt. Smolicz believed that he saw the plaintiff holding a knife alongside his leg. Exhibit F, pp. 104-105. Sgt. Smolicz also saw Ms. Liguori standing behind the plaintiff in the kitchen; her face was puffy and she was crying. Id., pp. 104-106.

9. The plaintiff appeared stunned, was sweating profusely and was breathing heavily. Exhibit D, R. Smolicz Test., p. 15. As soon as Sgt. Smolicz made eye contact with the plaintiff, the plaintiff closed and locked the main door. Exhibit G, p. 100. Sgt. Smolicz had not said anything before the plaintiff closed the door. Id., pp. 100, 102. The closest that Sgt. Smolicz came to the plaintiff was three-to-four feet. Id., p. 102.

10. After the plaintiff closed the door, he told Ms. Liguori that the police were at the door and that he was leaving. Exhibit G, p. 110. Within "7.2 seconds" of closing the door, the plaintiff had hidden himself under a king-sized bed in the master bedroom of the apartment. Exhibit G, pp. 103, 112, 130. The light was off in the bedroom in which the plaintiff was hiding. Id., p. 108. The plaintiff was attempting to get away from the police because he was in violation of his parole. Exhibit D, C. Liguori Test., pp. 69-70; Exhibit G, p. 115.

- 4 -

11. The police knocked on the door and asked for someone to open it. Exhibit D, C. Liguori Test., p. 59. Ms. Liguori opened the door within approximately ten-to-fifteen seconds. Exhibit D, R. Smolicz Test., p. 18; Exhibit B, p. 53; Exhibit E, p. 2. Ms. Liguori let the police into the apartment. Exhibit D, C. Liguori Test., p. 70; Exhibit G, p. 153.

12. When Ms. Liguori opened the door for the police, they asked her for the plaintiff's whereabouts; Ms. Liguori stated that the plaintiff had fled "out the back door." Exhibit G, pp. 109, 111; Exhibit D, C. Liguori Test., pp. 71, 73. The police then entered the apartment. Exhibit D, C. Liguori Test., p. 73.

13. The police in the apartment spoke with the officers who had been stationed outside the back of the apartment and were told that the plaintiff had not exited. Exhibit G, p. 109; Exhibit F, p. 117. The officers conducted a cursory search of the apartment, shouting for the plaintiff to come out of hiding, but they did not find the plaintiff. Exhibit F, pp. 117-18. See also Exhibit E, p. 2.

14. Believing the plaintiff posed an extreme danger to others, was wanted for felony charges and posed a flight risk, Sgt. Smolicz requested consent from Ms. Liguori for a K-9 search of her apartment. Exhibit E, p. 3. Sgt. Smolicz did so even though due to the plaintiff's flight risk he did not believe it was necessary. Id. In response, Ms. Liguori whispered to Sgt. Smolicz: "'If he hears me tell you yes, he'll kill me, just get him out of here.'" Id.

- 5 -

15. After his conversation with Ms. Liguori, Sgt. Smolicz requested that Officer Deeley and his canine partner, Argo, enter the apartment. Exhibit E, p. 3; Exhibit F, p. 119. See also 12/27/01 Amended Complaint, ¶ 7; 1/28/02 Answer and Affirmative Defenses to Plaintiff's Amended Complaint, ¶ 7. At that time, Sgt. Smolicz informed Officer Deeley that the plaintiff was armed with a knife. 8/22/02 Deposition of B. Deeley, the relevant excerpts of which are appended hereto as Exhibit H, p. 61.

16. At the time of the plaintiff's September 23, 1999 arrest, the Naugatuck Police Department ["the Department"] had implemented standard procedures regarding the use of canines that Sgt. Smolicz was required to follow. 3/12/04 Affidavit of Rick Smolicz, a copy of which is appended hereto as Exhibit I, ¶9. See also 12/12/90 Departmental Order Re: Canine Unit, a copy of which is appended hereto as Exhibit J.

17. On various occasions prior to September 23, 1999, Sgt. Smolicz had been present when canine handlers reviewed the policies and procedures regarding the use of canines, which reviews were usually done during roll call. Exhibit I, ¶10. Furthermore, on various occasions prior to September 23, 1999, Sgt. Smolicz had personally consulted with canine handlers to ensure that he had a clear understanding of the Departmental procedures that he and the other officers were required to follow when the canines were utilized. Id., ¶11.

18. The Department's policies noted that the "Canine Unit has been established to provide highly trained teams (Dog and Handler) to assist in all relevant aspects of police work."

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

Exhibit J, p. 1, Introduction. One of these aspects of police work was "[l]ocating and apprehending suspects." Id., ¶2.

  19. Under the Department's procedures and practices governing the use of canines:

> Canine deployment is the responsibility of the canine handler. A canine handler best knows the capabilities and limitations of his dog and is trained in tactical canine deployment situations. Supervisors should consider any advice relating to the deployment of a canine offered by the handler.

Exhibit J, p. 3, ¶5. As a member of the Canine Unit and Argo's handler, Officer Deeley had the sole authority under Departmental policy to determine whether and in what manner Argo would be deployed in effectuating the plaintiff's apprehension. Exhibit I, ¶ 8.

  20. Sgt. Smolicz was not a member of the Canine Unit. Exhibit I, ¶ 5. Sgt. Smolicz had no supervisory authority over the manner and method in which Officer Deeley deployed his canine partner, Argo, nor did he control or give commands to Argo. Id., ¶¶6, 7.

  21. Departmental policy provides that when a canine is to be deployed, "[t]he responding officers should seal off the surrounding area and not enter the area to be searched." Exhibit J, p. 7, Building Searches. See also Exhibit I, ¶12.

  22. On September 23, 1999, the plaintiff heard one of the police officers instruct another officer: "Remove [Ms. Liguori] from the house. She has to get out of the house. We are bringing the K-9 in." Exhibit G, p. 111.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

23. Departmental policy provides: "During the search the canine handler should be accompanied by another officer and this officer should follow any instructions given to him by the canine handler." Exhibit J, p. 7, Building Searches. See also Exhibit I, ¶14.

24. On September 23, 1999, the plaintiff heard Officer Deeley order other officers to stay in the kitchen and keep the kitchen area secured. Exhibit G, p. 111. See also Exhibit F, p. 120.

25. Departmental policy provides: "The canine handler will announce his intent to release the dog for a search, and will allow the suspect a reasonable amount of time to come out of hiding and give himself up." Exhibit I, p. 7, Building Searches.

26. On September 23, 1999, the plaintiff heard Officer Deeley give the following warning: "Come on out with your hands up . . . . Police with K-9. Come out with your hands up." Exhibit G, p. 109. Between thirty seconds and two minutes later, the plaintiff heard Officer Deeley repeat himself: "Police with K-9. Come out with your hands up." Id. See also Exhibit F, pp. 119-20; Exhibit H, pp. 63, 79; 1/7/03 Deposition of M. O'Mara, the relevant excerpts of which are appended hereto as Exhibit K, p. 87.

27. Departmental policy provides: "During a building search the canine works off leash and if the suspect is found he may be bitten when apprehended by the canine." Exhibit J, p. 7, Building Searches. See also Exhibit H, p. 68. When the plaintiff did not respond to Officer

- 8 -

Deeley's warnings, Officer Deeley dropped Argo's leash, which was the signal he used to direct Argo to seek and apprehend the plaintiff. Exhibit H, p. 64.

28. According to the plaintiff, Argo approached him "apprehensively, like he didn't come viciously to rip me apart to bite." Exhibit G, p. 134.

29. In fact, according to the plaintiff, Argo did not bite him until the plaintiff tried to pull himself away from the canine. Exhibit G, p. 134. Argo then attempted to apprehend the plaintiff by biting and holding the suspect. Exhibit H, p. 68.

30. According to the plaintiff, Argo's bites "weren't deep, gouging bites. They were just like hard nips that broke the skin." Exhibit G, p. 135. When Argo clamped the plaintiff's thigh, however, the plaintiff grabbed Argo's snout with both hands and fought him off. Id.

31. Officer Deeley heard what sounded like fighting coming from the bedroom. Exhibit H, pp. 65, 66-67. See also Exhibit F, pp. 122-24. When Office Deeley arrived at the bedroom door, Argo was already underneath the bed where the plaintiff was hiding. Exhibit H, p. 67.

32. Officer Deeley ordered the plaintiff to come out from underneath the bed. Exhibit F, pp. 123-24. When the plaintiff did not do so, Officer Deeley and Officer O'Mara turned over the mattress and the box spring of the bed. Exhibit F, p. 124; Exhibit H, p 67; Exhibit K, pp. 68, 75.

33.     If an individual does not resist, canines such as Argo are trained simply to bite and hold, and there is only one set of bite marks. Exhibit H, p. 89. If an individual resists and fights the dog, however, the canine will generally continue to try and get the best grip it can in order to hold him. Id.

34.     Officer Deeley informed the plaintiff that if he stopped resisting, Officer Deeley would call off Argo, but the plaintiff continued to struggle with the canine. Exhibit H, pp. 67 68; Exhibit K, pp. 70-71.

35.     Officer Deeley then spotted a knife on the floor. Exhibit H, pp. 67, 68-69. Sgt. Smolicz also saw it, as did Officer Purcaro and Officer O'Mara. Exhibit F, pp. 124-127; Exhibit B, p. 84. See also Exhibit K, p. 69. Upon seeing the knife, Officer Deeley "football tackled" the plaintiff. Exhibit H, p. 67.

36.     K-9 officers such as Argo are trained to bite a suspect when there is an altercation with the canine's handler. Exhibit J, p. 8, Handler Protection. When Officer Deeley "tackled" and wrestled with the plaintiff, Argo continued to bite the plaintiff. Exhibit H, p. 68.

37.     Officer Deeley ordered Argo to withdraw immediately upon securing one of the plaintiff's wrists in handcuffs. Exhibit H, pp. 70-71. See also Exhibit B, p. 68; Exhibit K, pp. 72-73. The September 23, 1999 incident involving the plaintiff was the only time that Argo had bitten an individual in more than one spot. Exhibit H, pp. 89-90.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

38.     The entire incident involving Argo and the plaintiff lasted no more than ten-to-fifteen seconds. Exhibit B, p. 66; Exhibit H, p. 70. According to Officer Deeley, it happened "in the blink of an eye." Exhibit H, p. 71. See also Exhibit K, p. 88.

39.     The plaintiff was the first individual that Sgt. Smolicz had seen resist a canine rather than quickly surrender. Exhibit F, pp. 128-29. According to the police officers, the plaintiff was punching Argo. Exhibit F, pp. 127-29; Exhibit H, pp. 67-68; Exhibit K, pp. 69, 72, 88. Argo had a tooth ripped out, requiring oral surgery, and his rear legs were also injured. Exhibit H, pp. 41, 87; Exhibit F, pp. 127-29.

40.     Departmental policy notes that if there is an altercation involving the handler, "assisting officers should stand back and wait for instructions from the canine handler. The canine may bite officers coming to assist." Exhibit J, p. 8, Handler Protection. See also Exhibit B, p. 82; Exhibit H, pp. 75-76; Exhibit K, pp. 82-83.

41.     Departmental policy further underscores the importance of assisting officers keeping a distance from the canine and its handler:

> In the event the canine handler is injured and the canine is not secured, use extreme caution in the approach of the handler. The canine may take the approach of assisting personnel as a threat and defend the handler by way of an attack as he is trained to do.

Exhibit J, p. 11, Injured Canine Handler. See also Exhibit I, ¶15.

42.     Departmental policy directs: "Personnel will not interfere with the canine team and their objective." Exhibit J, p. 12, General Rules and Conduct, ¶6. See also Exhibit I, ¶13.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

In accordance with Departmental policy, during the events of September 23, 1999, Sgt. Smolicz maintained a safe distance from Argo until Officer Deeley commanded Argo to withdraw. Exhibit I, ¶16.

43.   Sgt. Smolicz was approximately ten-to-twelve feet away from where Officer Deeley, Argo and the plaintiff were. Exhibit B, p. 65.

44.   Sgt. Smolicz did not participate in Officer Deeley's attempts to restrain the plaintiff. Exhibit H, pp. 75, 77; Exhibit B, p. 66; Exhibit K, pp. 73-74.

45.   When the plaintiff finally surrendered, Officer Deeley handcuffed plaintiff with the assistance of Officer Purcaro. Exhibit H, p. 71.

46.   At no point during the events leading up to, including and following the plaintiff's arrest on September 23, 1999 did Sgt. Smolicz strike the plaintiff or use any force whatsoever on him. Furthermore, at no point during the events leading up to, including and following the plaintiff's arrest did he threaten to strike or use force on him. Exhibit I, ¶18. The plaintiff has not alleged that Sgt. Smolicz struck or threatened to strike him. 12/27/01 Amended Complaint.

47.   At the time of the plaintiff's arrest, a knife was seized from under the same bed under which the plaintiff had been hiding. Exhibit H, pp. 69, 91.

48.   Following his arrest, the plaintiff was violent and non-compliant when Officer O'Mara took him to the police station. Exhibit K, pp. 77-78.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

49. The plaintiff was subsequently taken by ambulance from the police station to St. Mary's Hospital, where the hospital admission records characterized him as uncooperative and combative. 12/18/03 Deposition of Dr. Alan Couture, the relevant excerpts of which are appended hereto as Exhibit L, pp. 50-51. Laboratory results of plaintiff's blood sample taken within two hours of his arrest indicated a blood alcohol level of .119 mg/dl. Id., pp. 45-46.

50. The plaintiff had no trauma to the head nor did he have any trauma to the torso. Exhibit L, p. 52. The plaintiff did not have any broken bones, fractures or dislocations. Id., p. 53. The plaintiff's only medical complaint was a dog bite. Id., p. 52.

51. According to the plaintiff, on September 23, 1999 he had, in fact, physically assaulted Carmella Liguori after a verbal dispute, testifying that he had "kicked her in the ass." Exhibit G, p. 72.

52. On June 16 and 19, 2000, The Honorable William Cremins, Judge of the Connecticut Superior Court, held hearings on the plaintiff's Motion to Suppress in his criminal prosecution. Exhibit D. Prior to that hearing, the plaintiff's counsel had had open access to the State's file. Id., 6/19/00 Hearing, p. 8. Furthermore, at that hearing, the plaintiff was permitted to call witnesses on his behalf. Id., 6/19/00 Hearing, pp. 23-26, et al. The plaintiff was also permitted to cross-examine the witnesses called by the State. Id., 6/17/00 Hearing.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

53.   On June 21, 2000, Judge Cremins denied the plaintiff's Motion to Suppress in the matter of State of Connecticut v. David Kromhout, Docket No. CR-99-0284087-S.  6/21/00 Transcript of Hearing on Motion to Suppress, a copy of which is appended hereto as Exhibit M.

54.   In denying the plaintiff's Motion to Suppress, Judge Cremins held:

> Evidence was presented at the hearing from which the following facts could be found. Evidence included testimony and also the reports. One, the police were investigating a sexual assault allegedly involving the defendant. Two, the police had information that the defendant had been involved in another assault involving Carmella Liguori. Three, the victim of the sexual assault had stated to police that she had been told that the defendant was threatening to burn down the apartment building at 48 Washington Street in Naugatuck. Four, the police had information that the defendant was driving in what was described as a suspicious manner near the home of Carmella Liguori's mother on the evening of September 23, 1999. Five the police had information the defendant was possibly on parole from New York state and might be violent and possibly armed. Six, when the police arrived at the defendant's apartment and the door to the apartment was opened by the defendant, the testimony indicated that he had a knife in his hand. Number seven, the alleged victim was in the apartment with the defendant.
>
> The Court concludes that under the – totality of the circumstances, the police had reasonable grounds to enter the apartment to effect a valid arrest based on exigent circumstances and a reasonable belief that an emergency existed.

Exhibit M, pp. 7-8.

55.   Judge Cremins further noted that Ms. Liguori had testified that she had opened the door and let the police into the apartment.  Exhibit M, p. 3.

LAW OFFICES • SULLIVAN, SCHOEN, CAMPANE & CONNON, LLC • 646 PROSPECT AVENUE • HARTFORD, CONNECTICUT 06105-4286 • (860) 233-2141
JURIS NO. 62326

THE DEFENDANT,
RICK R. SMOLICZ,


By _____
Michael P. McKeon
Federal Bar No. ct02290
Sullivan, Schoen, Campane & Connon, LLC
646 Prospect Avenue
Hartford, Connecticut  06105-4286
Telephone:  (860) 233-2141
Facsimile:  (860) 233-0516
E-mail:  mmckeon@sscc-law.com

## CERTFICATION

This is to certify that a copy of the foregoing Defendant Rick R. Smolicz's Rule 56(a)(1) Statement was sent via express mail, overnight delivery, on the 18th day of March 2004 to Steven D. Jacobs, Esq., Jacobs, Jacobs & Shannon, P.C., 265 Orange Street, New Haven, Connecticut 06510 and to James Tallberg, One State Street, Updike, Kelley & Spellacy, Hartford, Connecticut 06103.

_____
Michael P. McKeon

- 16 -