FILED

2004 JUN -7 P 12: 48

U.S. DISTRICT COURT
BRIDGEPORT. CONN

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

DAVID S. KROMHOUT,                  :        CIVIL NO. 3:01 CV 1636 (SRU)
              **Plaintiff**     :
VS.                                 :
                       :
RICK R. SMOLICZ,                    :
MICHAEL PURCARO                     :
BART DEELEY                         :
TOWN OF NAUGATUCK.                  :
          **Defendants** :        **JUNE 4, 2004**

### PLAINTIFF'S OMNIBUS MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**STATEMENT OF FACTS:**

On and before September 23, 1999, the plaintiff, David Kromhout, was residing at 48 Washington Street, First Floor, Naugatuck, Connecticut with his then-girlfriend, Carmela Liguori. T. Deposition of David Kromhout, August 13, 2002 at 16-17. Between 8:30 and 9:30 p.m. that night, he was startled by the sound of loud knocking at the front door to that apartment. Id. at 93-98, T. Suppression Hearing, State of Connecticut vs. David Kromhout, Docket No. CR 99 024087, September 19, 1999 at 35-36. Mr. Kromhout, who had been with Ms. Liguori in her bedroom, cautiously answered the door, which opens into the kitchen of that apartment. T. Deposition of David Kromhout, supra at 83, 98, T. Suppression Hearing, September 19, 1999, supra.

Ms. Liguouri followed behind him less than 10 seconds later. T. Suppression Hearing,

September 19, 1999 at 35, 40. At that time, Mr. Kromhout did not have a knife in his

hand. T. Deposition of David Kromhout, supra at 166. Not knowing the kind of

reception that he would receive, Mr. Kromhout opened the door approximately 10

inches. T. Deposition of David Kromhout, supra at 99. At that time, he observed three

police officers. Id. at 99. At that time, there was a screen door to the apartment which

opened into a foyer. Id. at 100. At that time, Mr. Kromhout, observed an officer, who

he now knows to be defendant Smolicz, pull the screen door toward himself and

attempted to enter the apartment. Id. at 101. A second officer, who he now knows to

be defendant Michael Purcaro, stood immediately behind defendant Smolicz. Id. A

third officer stood behind defendant Purcaro. Id. Defendant Smolicz, without

explaining the reason for his presence, immediately lunged at Mr. Kromhout, attempting

"to get through the screen door as fast as he could." Id. Mr. Kromhout immediately

closed and double-locked the door. Id. at 101, 103. During that encounter, defendant

Smolicz stood approximately 3-4 feet from Mr. Kromhout. Id. at 102. At that time, Mr.

Kromhout heard the officers "screaming outside the door that if [he] didn't open the

fucking door, that they were going to beat [his] ass and kick [his] brains in", or words to

2

that effect. Id. at 103-104.  Mr. Kromhout then ran from the door toward the back of the

apartment.  Id. at 103.  As he did so, he did not see Ms. Liguouri in the kitchen/dining

room.  Id.  He went into Ms. Liguori's bedroom and hid underneath her bed.  Id. at 104.

He did so because the aggressive behavior of the police officers had made him fearful

that they would attack him.  Id. at 106.  As he proceeded from the kitchen to Ms.

Liguouri's bedroom, he passed Ms. Liguouri as she was proceeding from her bedroom

to the front door to the apartment.  Id. at 110.  As he passed her, he informed her that

he was leaving."  Id.  He lay on his back underneath the bed as the officers entered the

apartment and searched for him with a flashlight.  Id. at 109.  As he lay there, he heard

Ms. Liguori inform the officers that he had gone out the back door.  Id. at 110, 111.  He

heard an officer ask Ms. Liguouri whether she perceived her life to be in danger and

Ms. Liguouri's reply in the negative and statement that she and Mr. Kromhout had not

been fighting.  Id.  He heard an officer instruct the other officers to remove Ms. Liguouri

from the apartment as they would be bringing in 'the K-9."  Id.   He also heard an

officer twice shout "Police with K-9.  Come out with your hands up."  Id.  He did not

heed the officer's command.  Id. at 111.  Moments later, the mattress and box spring

under which Mr. Kromhout was lying were lifted up.  Id. at 131.  At that time, Mr.

Kromhout observed defendant Deeley with his K-9, Argo. Id. at 133. Mr. Kromhout remained still with his arms at his side. Id. At that time, defendant Deeley commanded Argo to "Attack!" Id. at 134. Argo first approached Mr. Kromhout "apprehensively" but became aggressive when Mr. Kromhout pulled his right leg toward his chest in an attempt to protect his genitals. Id. at 135. Argo then bit Mr. Kromhout n the inside of his thigh and then "twice more in very fast, rapid motions." Id. at 135. These bites weren't deep, gouging bites [but] just like hard nips that broke the skin. Id. Argo then clamped onto the inside of Mr. Kromhout's right thigh next to his testicles. Id. Mr. Kromhout then grabbed the top of Argo's snout with his right hand and the bottom part of his snout with his left hand in an attempt to prevent Argo from biting him. Id. at 135. As Mr. Kromhout lay on his back with the dog between his legs struggling to avoid being bitten, defendant Deeley began yelling at him, ran toward him, and kicked him in the head. Id. Defendant Deeley then sat on Mr. Kromhout's chest and began punching him repeatedly in the head. Id. As he did so, Argo chewed on Mr. Kromhout's left calf and ankle. Id. at 139, Exhibit E. All the while, defendants Smolicz and Purcaro just "stood there and watched and laughed." Id. at 142. Mr. Kromhout recalls observing defendants Deeley, Smolicz, and Purcaro "standing up, watching Argo chewing [him]

4

while [he] was handcuffed." Id. at 144.

Defendant Smolicz, by his own account, stood within "four to seven feet" of Mr. Kromhout as he was being attacked by Argo. T. Deposition of Rick Smolicz, infra at 126. Defendant Purcaro stood about ten to twelve feet away. T. Deposition of Michael Purcaro, August 22, 2002 at 63. Both stood by and watched but did not intervene. T. Deposition of Rick Smolicz, supra at 119-129, T. Deposition of Michael Purcaro, supra at 60-68. Defendants Smolicz, Deeley and Purcaro were each carrying a sidearm at the time of the events that occurred that night at 48 Washington Street. T. Deposition of Rick Smolicz, supra at 128.

Defendant Deeley was a trained K-9 handler. T. Deposition of Bart Deeley, August 22, 2002 at 7-18. According to defendant Deeley, there are limited circumstances in which a K-9 may be permitted to bite. Id. at 10. Those circumstances include the apprehension of "dangerous felons, armed suspects", an assault on a police officer, "anyone who is fighting with a police officer." Id. at 12, 13. In the case of a misdemeanor arrest, a K-9 may be commanded to bite "if there is resistance on the arrest and [he] is the arresting officer in charge of say interfering and now it turns into a fight . . . " Id. Otherwise, there are no circumstances which justify the use of a K-9 in

5

the apprehension of a suspected misdemeanant. Id. In defendant Deeley's lexicon, "apprehend" means "bite." Id. at 13, 64. When a K-9 is used to "apprehend", he is commanded to "get him." Id. at 11. Each time a K-9 is commanded to "get him", he will bite. Id.

At the time of the events which occurred at 48 Washington Street, Naugatuck, Connecticut on September 23, 1999, there was in effect a "Naugatuck Police Department Departmental Order", Order #GO 90-17, concerning the K-9 Division of the Naugatuck Police Department. Exhibit F. The express purpose of that order was "[t]o establish uniform policy for the use of the Naugatuck Police Department canines." Id. The order purports to prescribe the appropriate use of Naugatuck Police Department canines in, among other situations, "building searches." Id. at 2. It asserts that the primary duty of the K–9 Team is to

> to function as a patrol unit and carry out patrol functions. Patrol canines have a massive deterrent value that cannot be readily measured. It is an established fact that the mer presence of a trained canine team will deter subjects from committing a crime.

Id. at 3. It restricts the use of canines in building searches to cases in which "the resulting arrest is a felony." Id. at 7. It cautions that "during a building search the canine works off leash and if the suspect is found he may be bitten when apprehended

6

by the canine." Id. It adds that the canine has the capacity to alert the handler to the location of a suspect's hiding place. Id. In the event a person is bitten by a canine, the policy requires that a written statement from the bite victim be obtained. Id. at 10.

Pursuant to the Naugatuck Police Department 's canine policy, a log is kept concerning the activities of the department's canine's. That log reflects that between July 31, 1998 and August 22, 1999, the department's K-9 was used on twenty occasions. On eight of those occasions, the K-9 was used to "apprehend." On each such occasion, the suspect was bitten. On two of the eight occasions on which the K-9 was used to "track", the suspect was bitten. On each of the eight occasions, the K-9 was "Argo." Exhibit G. Chief Edward Clisham of the Naugatuck Police Department had actual knowledge of Argo's biting propensity. Deposition of Edward Clisham, December 18, 2003 at 49.

Argo remained in service until the summer of 2002. T. Deposition of Bart Deeley, August 22, 2002 at 33. During the time that he was in service, citizen complaints were made to the Naugatuck Police Department about him. T. Deposition of Edward Clisham, December 18, 2003 at 43. Although it was the ordinary course of the Naugatuck Police Department to refer citizen complaints to the Board of Police

7

Commissioners, none of the complaints about Argo were so referred. Id. at 30. Other than the complaints about Argo, the only complaints which have not typically been passed on to the Board of Police Commissioners are "the parking ticket type thing or winter snow ban stuff." Id. If the investigation of a citizen complaint is not completed within 60 dates of its receipt, it is dismissed with prejudice unless the time for completing the investigation is extended by mutual agreement of the department and the complainant. Id. at 31-32.

Defendant Deeley, accompanied by his K-9, Argo, entered 48 Washington Street, First Floor on the night of September 23, 1999 for the express purpose of finding Mr. Kromhout. Without knowing Mr. Kromhout's whereabouts within the apartment, defendant Deeley commanded Argo to "apprehend" him. Id. at 63-64. In doing so, he intended that Argo bite Mr. Kromhout. Id. at 64. Shortly thereafter, defendant Deeley was drawn to the rear bedroom of the apartment by the sound of "wrestling" and "fighting". Id. at 66. There, he observed Argo underneath the bed "all the way up to his behind. Id. at 67. Argo was already biting Mr. Kromhout as he lay underneath the bed. Id. at 68. He then lifted the bed to reveal Argo biting Mr. Kromhout as Mr. Kromhout lay on his back. Id. Argo was not commanded to "break." According to defendant Deeley,

8

the "break" command was not given until after Mr. Kromhout had been placed in handcuffs. Id. at 73.

Throughout the entire course of events that transpired at 48 Washington Street, First Floor, Naugatuck, Connecticut that night, Mr. Kromhout did not in any way resist or struggle with the defendants. To the contrary, he was supine as inert freight. He did not at any time strike any of the defendants or attempt to do so. His only struggle was with the K-9. That struggle was motivated by the most primal of instincts – self-preservation. He did not strike Argo but merely held onto his snout in an effort to protect himself Id.

At no time during the events which occurred at 48 Washington Street, First Floor, Naugatuck, Connecticut on the night of September 23, 1999 did Ms. Liguori hear a police officer cry out in pain. T. Suppression Hearing, supra at 45. At no time during those events did Ms. Liguouri hear an officer cry "Knife!". Id. at 58.

As a result of being attacked by Argo and punched repeatedly by defendant Deeley, Mr. Kromhout suffered severe, painful and permanent injuries consisting of multiple lacerations and puncture wounds to his left leg from multiple dog bites, multiple dog bites to his right and left inner thighs. He was admitted to St. Mary's Hospital for

9

treatment of those injuries on September 23, 1999 and discharged on September 27, 1999. Exhibit E. He later suffered from infection and pitting edema, a condition which causes swelling and pitting of the affected tissue. Exhibit H, T. Deposition of Mark Weinstein, March 10, 2004 at 36.

Although there is no reference in the St. Mary's Hospital record to the bruises, contusions, and abrasions which Mr. Kromhout sustained to his face and head as a result of being pummeled by defendant Deeley, the consequences of that pummeling were readily apparent to Father Lawrence LeClair when, as a St. Mary's chaplain, he visited with Mr. Kromhout several days after the event of September 23, 1999:

> His face was very swollen; swollen so much so that, you know, you could almost – I could not really say where all the abrasions were – but his face was swollen and out of contact. He had – seemed to have a black eye of some sort, but that I could not verify; but it was apparent.
>
> But exactly what the abrasions were, I don't know. But his face was really swollen. And it had been bleeding, so there was cuts of some sort.

T. Deposition of Father Lawrence LeClair, January 23, 2004 at 9. Although Father LeClair did not know Mr. Kromhout prior to visiting with him that day, it was obvious to him that Mr. Kromhout's appearance was the result of a recent traumatic event:

> Q.    Well, how do you know that his face was very swollen never having seen him before?

10

> A.     Because of the incisions and the coloring of his face, the paleness, the –
> you know yo can tell when a person has been in an accident of some sort; and
> you know it's not know.

*          *          *

> . . . A couple of weeks later I went down to New Haven to visit him in jail; I was
> on the list of his.  And I didn't recognize him when he came – when he came to
> the window.  I looked at him; and his features were so changed, and his face
> was not he size that it was.  It was – it seemed to be normal.  And he only had a
> few marks or scratches or whatever they were.  I don't know . . . I said, "what a
> change."  I said I remember my opening statement to him was, "what a change in
> a few weeks.  Apparently, you're getting over it."

Id. at 9, 11.  The severity of the wounds to Mr. Kroumhout's legs disturbed Father

LeClair:

> . . . His leg, one of them was really chewed out, and the skin was torn.  It was
> really-- I felt disgusted.  When I saw this, I said, "How did you do this?" . . . I – he
> showed me the abrasion, the legs – I was – I got sick.

Id. at 9-10.  He was equally disturbed by the callous treatment that he received from the

police officers that were guarding Mr. Kromhout at the time of that visit:

> They were very callous.  They were very – I mean, I was wearing my
> uniform and all.  So there was no – and I wasn't trying to look for any favors or
> anything like that.

*          *          *

11

Well, the first time, as I was saying, I was kicked out of the room right away. Then I went back because after the visit I gave the cops perhaps one hour or so. I was insulted . . .

. . . And I remember Dave trying to tell me what had happened. And I went like this (gesturing) because I said, "There is a policeman at the door; that's not what I'm here for."

Id. at 8, 20, 21. The visit was terminated abruptly after five minutes when a police officer entered the room and ordered Father LeClair to "get out." Id. at 22, 27.

Dr. Mark Weinstein, a plastic surgeon, examined Mr. Kromhout on March 12, 2003. T. Deposition of Mark Weinstein, M.D., March 10, 2004 at 25. At that time, he noted that Mr. Kromhout had 14 punctate (less than one centimeter) scars to his left lower extremity. Id. According to Dr. Weinstein, those scars are consistent with a dog bite. Id. at 33. They could not have happened with one bite because they were in the whole lower extremity. Id. at 43. In order for the bites to have created a scar they would have had to penetrate the epidermis. Id. at 46. Athough those scars have left Mr. Kromhout with no functional impairment, they are permanent in their appearance and probably not revisable. Id. at 33-34.

12

**ARGUMENT:**

I.   **THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO THE PLAINTIFF'S CLAIM AGAINST DEFENDANT SMOLICZ UNDER 42 U.S.C. §1983.**

"Police officers have an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in their presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2nd Cir. 1988)(internal quotation marks omitted). Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be. Anderson v. Branen, 17 F.3d Anderson 552, 557 (2nd Cir. 1994), as cited in Curley v. Village of Suffern 268 F.3d 65, 72 (2nd Cir. 2001). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." Anderson v. Branen, supra, as cited in Jones v. City of Hartford, 285 F.Supp. 174, 182 (D.C. Conn. 2003). In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. Anderson v. Branen, supra at 557. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.

13

Id. Whether excessive force was being used at the time the defendant allegedly failed to intercede on the plaintiff's behalf must be judged according to the standard of "objective reasonableness", i.e. whether the actions of the officer charged with using excessive force were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. Graham v. Connor, infra at 397. In sum, the analysis of an officer's alleged failure to intercede to prevent a fellow officer from violating a citizen's civil rights is necessarily fraught with issues of fact.

Anderson v. Branen, supra, was an action brought pursuant to 42 U.S.C. §1983 claiming injuries and losses arising from the use of excessive force by the defendants, agents of the United States Drug Enforcement Administration. The plaintiffs had testified at trial that they had been beaten, "suddenly and without warning", by the defendants and subjected to a barrage of homosexual epithets after the foot peg of the motorcycle that co-plaintiff Grubb had been operating accidentally struck the bumper of the parked car in which the defendants were seated. They further testified that they offered no resistance to the defendants. The defendants, needless to say, offered a strikingly different version of the events:

> [Defendant Kindestin] opened the door [to his vehicle] and observed a man on a motorcycle, Grubb, engaged in a verbal exchange with Kindestin. Immediately thereafter, a second individual, Anderson, lunged at Kindestin from behind, at which point Branen went to Kindestin's assistance. Wisniefski left the garage and

14

> interrupted the fight between Branen and Anderson by grabbing Anderson by the
> waist and pushing him over the hood of the car.

Id. at 555.  At the close of evidence, the plaintiffs asked the court to charge the jury on

the duty of each defendant to intercede to prevent the other from violating the plaintiffs'

civil rights.  The court denied the request.  In reversing that decision, the Second Circuit

Court of Appeals concluded that the plaintiffs' "request for an instruction on the duty to

intervene was clearly supported by at least some evidence of probative value [such

that] the jury should have been given the opportunity to weigh this evidence and apply

the instruction.  Id. at 558.

The plaintiff in Curley v. Village of Suffern, infra, claimed to have been injured as

a result of an encounter with police officers of the Village of Suffern, New York which

arose from a barroom brawl.  He claimed, among other things, that some of the officers

used excessive force in effectuating his arrest and that others stood by indifferently and

watched.  The district court granted summary judgment for two of the officers on the

claim that they had failed to intercede to prevent other officers from violating the

plaintiff's civil rights.  In affirming that decision, the Second Circuit Court of Appeals

concluded that the evidence failed to establish that the defendants who had been

charged with failing to intercede were in a position to do so:

> Plaintiff himself testified that he could not recall whether Venturini was in the pub
> or with the other officers, or whether Osborn was involved in the arrest. Officers
> Venturini and Osborn testified that they were trying to disperse the crowd

15

gathering outside Mugg's Pub after the fight. Venturini said he saw plaintiff being carried towards the police car by four officers, but did not see him being handcuffed and did not indicate that he knew how plaintiff was placed in the police vehicle-the two events during which plaintiff claims to have sustained injuries.

Curley v. Village of Suffern 268 F.3d at 72.

In contrast to Curley, defendants Smolicz and Purcaro were present when defendant Deeley commanded Argo to bite Mr. Kromhout. Smolicz and Purcaro stood within ten feet of Mr. Kromhout as he was being attacked by Argo. Neither did anything to stop the carnage. If you believe Mr. Kromhout, they just stood there and laughed. And therein lies the issue of fact: as in Anderson v. Branen, infra, the versions of the events of September 23, 1999 differ greatly. The jury should be the ultimate judge of credibility and truth.

**II.    THERE IS A GENUINE ISSUE OF FACT AS TO WHETHER ARGO'S ATTACK ON MR. KROMHOUT AND DEFENDANT DEELEY'S INSTIGATION OF AND ACQUIESCENCE IN THAT ATTACK AMOUNTED TO THE USE OF EXCESSIVE FORCE.**

In order to establish that the use of force to effect an arrest was unreasonable and therefore a violation of the Fourth Amendment, plaintiffs must establish that the government interests at stake were outweighed by "the nature and quality of the intrusion on [plaintiffs'] Fourth Amendment interests." Graham v. Connor, 490 U.S. 386,

16

396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In other words, the factfinder must

determine whether, in light of the totality of the circumstances faced by the arresting

officer, the amount of force used was objectively reasonable at the time. Id. at 397, 109

S.Ct. 1865. The inquiry therefore "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others,

and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at

396, 109 S.Ct. 1865. Given the fact-specific nature of the inquiry, granting summary

judgment against a plaintiff on an excessive force claim is not appropriate unless no

reasonable factfinder could conclude that the officers' conduct was objectively

unreasonable.  See O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir.2003).

   "[I]f an excessive force claim turns on which of two conflicting stories best

captures what happened on the street, Graham will not permit summary judgment in

favor of the defendant official. And that is as it should be. When a plaintiff proffers

evidence that the official subdued her with a chokehold even though she complied at all

times with his orders, while the official proffers evidence that he used only stern words,

a trial must be had."  Saucier v. Katz, 533 U.S. 194, 216, 121 S.Ct. 2151, 2164 (2001).

17

Graham will not permit summary judgment in favor of the defendants in this case. And that is as it should be.

The defendants have spun a yarn designed to enable them to avoid liability for the torture and pain which they inflicted on Mr. Kromhout. Sergeant Smolicz admits that he did not have probable cause to arrest Mr. Kromhout at the time he and the co-defendant's proceeded to 48 Washington Street, First Floor on the night of September 23, 1999. T. Suppression Hearing, June 16, 2000 at 43. He justifies his entry into that apartment by confabulating a knife-wielding, air-sucking, sweat-oozing monster in Mr. Kromhout greeting him at the door. T. Suppression Hearing, June 16, 2000 at 15. In an image reminiscent of a D.W. Griffith film, an imperiled Carmela Liguouri stands in the background (or was it the foreground and, after all, does it really matter? Background, foreground – what's the difference?) with "tears coming down her face", her face "puffy" as if she had been crying", clearly visible to Sergeant Smolicz through a 8-18" (or was it 16-18"?) opening into a dark apartment. T. Suppression Hearing, June 16, 2000 at 40, T. Deposition of Rick Smolicz, infra at 102, 103, 106. Exhibit I. He purports to justify the degree of force used against Mr. Kromhout that night, in part, on information describing him as an armed and dangerous parole violator even though he

18

did not have that information at the time of those events.  T. Suppression Hearing, June 16, 2000 at 34, Exhibit I.  Indeed, he does not even recall whether such information would have been available to him at that time, given the state of the department's resources.  T. Deposition of Rick Smolicz at 54.

It is undisputed that Sergeant Smolicz and Officer Purcaro did not intervene to prevent Argo from biting Mr. Kromhout.  The defendants claim that this was in keeping with the department's K-9 policy, which instructs non-K-9 officers to defer to the K-9 officer in matters relating to the use of the K-9.  The canine policy cannot, however, trump the fourth amendment to the United States Constitution.  If the use of the canine, or the extent to which the canine was permitted to maim an individual, was unjustifiable under the circumstances – as Mr. Kromhout claims it was -- then Sergeant Smolicz and Officer Purcaro had a duty to intervene to protect Mr. Kromhout, regardless of the department's K-9 policy.  Indeed, the physical evidence corroborates Mr. Kromhout's account: Argo did not merely grab and give him a few nips, as the defendants would have the court believe he did, but, rather, bit him in the right thigh – perilously close to his genitals – and bit him repeatedly – at least seven times -- in the lower left leg.  T. Mark Weinstein, M.D., infra at 33.  Officer Deeley admits that he intended not just for

19

Argo to locate Mr. Kromhout but also to bite him. He admits that Argo was allowed to continue biting Mr. Kromhout even after Mr. Kromhout had been located, and commanded Argo to "break" only after Mr. Kromhout had been subdued. He admits that Argo was purposely allowed to continue biting Mr. Kromhout so long as Mr. Kromhout resisted him.

It is undisputed that Mr. Kromhout attempted to protect himself from the dog. The manner in which he attempted to do so is, on the other hand, in dispute – Mr. Kromhout claiming that he attempted in vain to hold the dog's snout, Officer Deeley claiming that Kromhout used Argo's face as a punching bag. The jury must be left to determine who is telling the truth.

Mr. Kromhout claims that it was his head, not Argo's, that was used as a punching bag. He claims that Officer Deeley, in a wanton display of excessive force, struck him repeatedly in the face as Argo was chewing away at his lower extremity. He claims that he was helpless to resist or harm the defendants in any way as he lay supine, preoccupied with the dog that was clamped onto his lower extremity and was surrounded by several uniformed police officers, each equipped with a gun. In contrast, Officer Deeley tells a dramatic tale about the risk of harm to himself that he perceived

20

when he allegedly observed a knife near Mr. Kromhout, and offers that as justification for the degree of force used to subdue Mr. Kromhout.

Finally, there is the matter of the phantom injuries to Mr. Kromhout's face and head. The defendants claim that Mr. Kromhout's claim that he was struck repeatedly in the face by Officer Deeley is contradicted by the St. Mary's Hospital record, which contains no reference to facial and head injuries, and the testimony of Dr. Coutoure, who supervised the St. Mary's Hospital emergency room on the night of September 23, 1999. Dr. Coutoure, however, is unable to offer any opinions independent of the hospital record as he has no present recollection of Mr. Kromhout and the injuries that he sustained on the night of September 23, 1999. On the other hand, Father LeClair, who must answer to a higher authority, distinctly recalls Mr. Kromhout's appearance when he visited him several days after the incident:

> His face was very swollen; swollen so much so that, you know, you could almost – I could not really say where all the abrasions were – but his face was swollen and out of contact. He had – seemed to have a black eye of some sort, but that I could not verify; but it was apparent.

> But exactly what the abrasions were, I don't know. But his face was really swollen. And it had been bleeding, so there was cuts of some sort.

*          *          *

. . .His leg, one of them was really chewed out, and the skin was torn. It was really-- I felt disgusted. When I saw this, I said, "How did you do this?" . . . I – he showed me the abrasion, the legs – I was – I got sick.

T. Deposition of Father Lawrence LeClair, infra at 9-11.

Shame on the officers who summarily and rudely banished Father LeClair from Mr. Kromhout's hospital room! The question is: why was a priest treated with such disrespect? The likely answer is that the officers, who included Sergeant Smolicz, did not want anyone, including a chaplain, to see Mr. Kromhout in the condition that he was in and to learn of the circumstances that put him there. As the late Fred (Mister) Rodgers would have said: "Can you say 'consciousness of guilt?'" Mr. Kromhout deserves the opportunity to argue that to the jury.

Defendants Deeley and Purcaro suggest that this court be guided by the decision of the Ninth Circuit Court of Appeals in the matter of Miller v. Clark County, 340 F.3d 949 (9th Cir. 2003). As if it isn't obvious, however, we are not in the Ninth Circuit. While we do not know the general approach of the Ninth Circuit to motions for summary judgment filed in excessive force cases, we do know that the Second Circuit is deferential to the right of the parties to try such cases given that their facts are often in dispute. To quote, again, from Saucier v. Katz, infra, "[I]f an excessive force claim turns

on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official. And that is as it should be.

This case is replete with issues of fact that must be left to the jury to decide. A fair determination of the facts can only come from a jury that has had the opportunity to hear and see the evidence and assess the credibility of the witnesses.

If dogs could talk . . .

## III.    THE PLAINTIFF IS NOT CLAIMING FALSE ARREST.

The plaintiff's claim under 42 U.S.C. §1983 is based only on a theory of excessive force. It is not based on a theory of false arrest, and defendant Smolicz, in Section III(B)(2) on his brief, acknowledges this. Therefore, defendant Smolicz's argument that the decision of the Connecticut Superior Court (Cremins, J.) following the suppression hearing held in the matter of <u>State of Connecticut vs. David Kromhout</u> should be given preclusive effect in any false arrest claim asserted in this lawsuit by Mr. Kromhout is inapposite.

23

**IV.    THE DECISION OF THE CONNECTICUT SUPERIOR COURT FOLLOWING THE SUPPRESSION HEARING HELD IN THE MATTER OF <u>STATE OF CONNECTICUT VS. DAVID KROMHOUT</u> SHOULD NOT BE GIVEN PRECLUSIVE EFFECT IN THIS CASE.**

28 U.S.C. §1738, commonly known as the "Full Faith and Credit Statute",

provides, in pertinent part, as follows:

> The records and judicial proceedings of any court of any ... State [of the United States] ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State....

28 U.S.C. §1738, as cited in <u>Cameron v. Fogarty</u>, 806 F.2d 380 (2ⁿᵈ Cir. 1986).

It requires that a federal court give "the same preclusive effect as would be given that

judgment under the law of the State in which the judgment was rendered," <u>Migra v.

Warren City School District Board of Education</u>, 465 U.S. 75, 81, 104 S.Ct. 892, 896,

79 L.Ed.2d 56 (1984), *as cited in* <u>Cameron v. Fogartty</u>, supra.  Under Connecticut law,

"[c]ollateral estoppel precludes a party from re-litigating issues and facts actually and

necessarily determined in an earlier proceeding between the same parties or those in

privity with them upon a different claim." <u>DeLaurentis v. New Haven</u>, 220 Conn. 225,

239 (1991).  "To invoke collateral estoppel the issues sought to be litigated in the new

proceeding must be identical to those considered in the prior proceeding." <u>Crochiere v.

Board of Education</u>, 227 Conn. 333, 345, 630 A.2d 1027 (1993), as cited in <u>Young v.

24

Metropolitan Property and Casualty Ins. Co. 60 Conn.App. 107, 113, 758 A.2d 452, 455 - 456 (2000). Privity "is, in essence, a shorthand statement for the principle that collateral estoppel should be applied only when there exists such an identification in interest of one person with another as to represent the same legal rights so as to justify preclusion." Id. at 456.

Defendant Smolicz argues that the Judge Cremins' decision following the suppression hearing held in the criminal matter which arose from the events of September 23, 1999 should be given preclusive effect in this case. That argument must fail, however, because the issues litigated at the suppression hearing were not the same as the issues being litigated here. Were this a false arrest case, that decision would properly be given preclusive effect as the issue litigated before Judge Cremins and in which the parties to this action each participated concerned the lawfulness of the defendants' entry into Mr. Kromhout's apartment. However, this case does not concern the right of the defendants to enter the apartment but, rather, their right to use the degree of force that they used in arresting Mr. Kromhout. The suppression hearing did not in any way address that issue.

## V.    OFFICERS DEELEY AND PURCARO ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Defendant Deeley and Purcaro's rendering of the law of qualified immunity is accurate and, therefore, need not be repeated here. Their application of that law to the

25

facts of this case, however, is incorrect.

As defendants Deeley and Purcaro have stated, a government official is entitled to qualified immunity if he can establish "upon facts that are undisputed either that their conduct did not violate 'clearly established rights' of which a reasonable person would have known, or that it was objectively reasonable to believe that their acts did not violate those clearly established rights." Soares v. State of Connecticut, 8 F.3d 917, 920 (2nd Cir. 1993).  Defendants Deeley and Purcaro are not entitled to qualified immunity because (1) the facts upon which their claim of qualified immunity is based are is dispute; (2) they are being charged in this case with violating a clearly established right of Mr. Kromhout's, namely his right under the fourth amendment to the United States Constitution to be free from unreasonable searches and seizures; and (3) viewing the evidence in a light most favorable to the plaintiff, it was not objectively reasonable for them to believe that their acts did not violate those clearly established rights."  Indeed, assuming that Mr. Kromhout's account of the events of September 23, 1999 are accurate, Officer Deeley committed an atrocity while Officer Purcaro, standing idly by, condoned his unlawful behavior.  Given those facts, no officer of reasonable competence could have made the same choice in similar circumstances as they did.  cf. Williams v. Lopes, 64 F.Supp. 2d 37 (D. Conn. !999).

26

**VI.    THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO THE PLAINTIFF'S <u>MONELL</u> CLAIM.**

Defendant Deeley and Purcaro's rendering of the law of municipal liability for constitutional violations is accurate and, therefore, does not bear repeating.

The facts of this case establish a pattern of deliberate indifference by the Borough of Naugatuck, through its police officers, including its police chief, Edward Clisham, to the rights of citizens. It kept in service a K-9 that it knew to have a propensity to bite, even under circumstances when biting was not warranted under the terms of its own canine police, e.g. tracking, misdemeanor violations (see "Apprehension Policy: A Naugatuck Police Department canine handler will not deploy his canine for an attack apprehension of fleeing suspects whose offense would constitute only a misdemeanor violation of the law." Exhibit F at 10. It allowed Argo to remain in service, and defendant Deeley to continue to handle him, even though it knew that citizen complaints had been made about Argo. T. Deposition of Edward Clisham, infra at 30. It ignored those citizen complaints and disposed of them as it would routine complaints about parking tickets and snow removal bans. <u>Id.</u> at 43. It allowed a dangerous animal, and an incompetent handler, to remain in service to the police department, thereby putting David Kromhout and others in harm's way.

If these facts are not enough to prove Mr. Kromhout's <u>Monell</u> claim by a fair preponderance of the evidence, they are certainly enough to establish that there is a

27

genuine issue of material fact as to that claim.

### VII.    THE PENDENT STATE COMMON LAW CLAIMS.

These claims are properly in this court, the court having exercised pendent jurisdiction over them.  For the reasons set forth in Section II of this brief, the plaintiff submits that there are ample and genuine issues of fact as to these claims that they should be presented to a jury.

### VIII.    THE PLAINTIFF'S CLAIM PURSUANT TO CONN. GEN. STAT. §22-357.

The plaintiff does not oppose defendant Deeley and Purcaro's motion for summary judgment on the claim of the plaintiff brought pursuant to Conn. Gen. Stat. §22-357.

### CONCLUSION:

For the reasons set forth herein, the defendants' Motions for Summary Judgment should be denied.

THE PLAINTIFF

BY: _____
STEVEN D. JACOBS, ESQ.
JACOBS, JACOBS & SHANNON, P.C.
265 ORANGE STREET
NEW HAVEN, CT 06510
(203) 562-6111
JURIS NO. 28927

28

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed, postage prepaid, this 4th day of June, 2004 to: Attorney Michael McKeon, Sullivan, Schoen, Campane & Connon, LLC, 646 Prospect Street, Hartford, CT 06105-4286, and Attorney James Tallberg, Updike, Kelly & Spellacy, One State Street, Hartford, CT 06103.

_____
STEVEN D. JACOBS